**In re WHEAT RAIL FREIGHT RATE ANTITRUST LITIGATION.**

No. MDL 534.

United States District Court,
N.D. Illinois, E.D.

Feb. 6, 1984.

See also, D.C., 579 F.Supp. 510.

Ross L. Thorfinnson, Perbix, Harvey & Thorfinnson, P.A., Hopkins, Minn., Robert J. Fulgency, Sr. Associate Counsel, General Mills, Inc., Minneapolis, Minn., for plaintiff General Mills, Inc.

James R. Scoggin, Perbix, Harvey & Thorfinnson, P.A., Hopkins, Minn., for plaintiff DCA Food Industries, Inc.

Richard P. Campbell, Anthony S. DiVincenzo, Campbell & DiVincenzo, Chicago, Ill., David Brezina, John Brezina, Burton Ehrlich, Brezina & Buckingham, Chicago, Ill., for plaintiffs Little Crow Milling Co., Inc. and Midstate Mills, Inc.

Thomas C. Dorsey, American Short Line R.R. Ass'n, Washington, D.C., for defendant American Short Line R.R. Ass'n.

Roland W. Donnem, Charles C. Rettberg, Jr., Patricia Vail, Chessie System Railroads, Cleveland, Ohio, James R. Gannon, Lewis, Overbeck & Furman, Chicago, Ill., for defendants Baltimore and Ohio R. Co., Inc., Chesapeake and Ohio R. Co., Inc. and Chicago South Shore & South Bend R.R.

Bruce B. Wilson, Margaret W. Weiner, Consolidated Rail Corp., Laurence Z. Shiekman, Deborah F. Cohen, Philip H. Lebowitz, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Max Wildman, Jerald P. Esrick, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant Consol. R. Corp.

Kinga LaChapelle, Delaware & Hudson R. Co., Albany, N.Y., Thomas A. Donovan, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., Karla J. Letsche, Kirkpatrick, Lockhart, Hill, Christopher & Phillips, Washington, D.C., James G. Heiring, James H. Ryan, Keck, Mahin & Cate, Chicago, Ill., for defendant Delaware and Hudson Ry. Co.

W. Gerald Thursby, Clifton Lake, David C. Gustman, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., Kenneth C. Anderson, Squire, Sanders & Dempsey, Washington, D.C., for defendant Elgin, Joliet & Eastern Ry. Co.

John C. Danielson, Grand Trunk Western R. Co., Detroit, Mich., Erwin C. Heininger, William J. Reifman, Daniel D. Beckel, Mayer, Brown & Platt, Chicago, Ill., for defendant Grand Trunk Western R. Co.

Duane M. Kelley, James A. Vroman, Winston & Strawn, Chicago, Ill., for defendant Illinois Central Gulf R. Co.

Wandaleen Poynter, Seaboard Coast Line R. Co., Jacksonville, Fla., for defendants Louisville & Nashville R.R. and Seaboard Coast Line R. Co.

James R. Gannon, Lewis, Overbeck & Furman, Chicago, Ill., for defendants Louisville & Nashville R., Seaboard Coast Line R. Co. and Richmond, Fredericksburg & Potomac R. Co.

James E. Sykes, Commerce Counsel, Mo. Pacific R. Co., St. Louis, Mo., James H. Durkin, Commerce Counsel, Mo. Pacific R. Co., Chicago, Ill., for defendant Missouri Pacific R. Co.

Richard J. Flynn, G. Paul Moates, R. Merinda Wilson, Stephen S. Hill, Sidley & Austin, Washington, D.C., for defendants Illinois Terminal R. Co. and Norfolk and Western Ry. Co., Inc.

Kirk B. Johnson, Sidley & Austin, Chicago, Ill., for defendants Illinois Terminal R. Co., Norfolk and Western Ry. Co., Inc. and Toledo, Peoria & Western R. Co.

John M. Clifford, Stephen A. Trimble, Hamilton & Hamilton, Washington, D.C., Urchie B. Ellis, Richmond, Fredericksburg, & Potomac R. Co., Richmond, Va., for defendant Richmond, Fredericksburg & Potomac R. Co.

John M. Nannes, Paul J. Kaleta, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for defendants Traffic Executive Ass'n, Eastern Railroads, and Eastern Railroads Ass'n.

Richard E. Weicher, Weston Marsh, Santa Fe Industries, Inc., Chicago, Ill., for defendant Toledo, Peoria & Western R. Co.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This multidistrict antitrust litigation involves wheat rail freight rates. The plain-

tiffs, shippers of wheat and wheat products, allege that the defendant railroads violated Sherman Act § 1, 15 U.S.C. § 1 (1976) by fixing the price of rail freight rates for wheat and wheat products without following the procedures required to exempt their conduct from antitrust liability under the Interstate Commerce Act, 49 U.S.C. § 10706 (Supp. III 1979). Many motions have been filed and decided. The issues which remain are: 1) whether the Interstate Commerce Commission (ICC) has exclusive jurisdiction over the conduct in question; 2) whether certain plaintiffs sought reparations before the ICC and if so, whether they have elected their remedy and are barred from pursuing their antitrust claims; 3) whether defendants' conduct is expressly immune from antitrust liability; 4) or impliedly immune from antitrust liability; 5) whether defendants' conduct is immune under the *Noerr-Pennington* doctrine; 6) whether, if defendants' conduct is not immune, it constitutes a per se violation of Sherman Act § 1; 7) whether the parties are collaterally estopped by the ICC finding on damages; and 8) whether a group of plaintiffs should be certified as a class.

 The litigation concerns rail freight rates for wheat and wheat products from Chicago to the east. Under 49 U.S.C. § 10706(a)(2)(A), two or more rail carriers may enter into an agreement relating to rates. If the ICC approves the agreement,[1] the railroads may carry out the agreement without antitrust liability.[2] The defendant railroads have joined in such an agreement—the Agreement of the Eastern Railroads Under Section 5b of the Interstate Commerce Act[3] (Agreement). The ICC has approved the agreement, *see Eastern Railroads—Agreements*, 277 I.C.C. 279 (1950), so when the railroads adhere to the Agreement, they are statutorily immune from the antitrust laws.

The Agreement prescribes a procedure to be followed before a proposal on rates or other matters is filed with the ICC. The parties to the Agreement are divided into committees, A written proposal must first be submitted to the chairman of the appropriate committee. Agreement, Art. III, § 2. The chairman then gives public notice of the proposal in the next issue of Traffic World or another recognized traffic publication. *Id.* § 3. All interested persons, including shippers, are given fourteen days from the date of publication to communicate to the chairman views on the proposal. *Id.* If the chairman receives no objection to the proposal within fourteen days, it is presumed that all parties to the agreement have approved the proposal. *Id.* § 5. If an interested person does object, then the chairman dockets the proposal for hearing at the committee's next meeting. *Id.* § 6. At the meeting, shippers and other interested persons have an opportunity to be heard. *Id.* § 8. Each member of the committee receives one vote on the proposal. *Id.* § 9. After the vote, organization members may request review of the vote by the Traffic Executive Association. *Id.* § 11. The Traffic Executive Association is composed of all class I railroads that are parties to the Agreement. *Id.* Art. II, § 3. Once a determination on a proposal is final, notice of the determination is published in

---

**1.** Section 10706(a)(2)(A) provides in part:

A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... that is a party to an agreement of at least 2 rail carriers or an agreement with a class of carriers ... that relates to rates ..., classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them, shall apply to the Commission for approval of that agreement ... If the Commission approves that agreement, it may be made and carried out under its terms and under the conditions required by the Commis-

sion, and the Sherman Act (15 U.S.C. 1, et seq.) [and] the Clayton Act (15 U.S.C. 12, et seq.) ... do not apply to parties and other persons with respect to making or carrying out the agreement.

**2.** To approve an agreement under § 10706, the ICC must find that "the making and carrying out of the agreement will further the transportation policy of section 10101a of this title...." 49 U.S.C. § 10706(a)(2)(A).

**3.** Section 10706(a)(2)(A) was formerly codified as 49 U.S.C. § 5b (1976).

Traffic World or another recognized traffic publication, and the tariff is filed with the ICC. *Id.* Art. III, § 10.

The Agreement enumerates various exceptions to the procedural requirements. Two of these exceptions are relevant to this case. Notice and hearing are excused when a proposal is "of such emergency character that the customary procedure as provided herein cannot reasonably be followed." *Id.* § 8. Such procedure is also unnecessary "[f]or changes in rates or charges growing out of decisions of and orders by the Interstate Commerce Commission, or State Commissions, and changes in rates having a recognized relation to those directly affected by such decisions or orders." *Id.* App. E ¶ 8.

Once a rate is filed with the ICC, the ICC may, on its own initiative or on complaint of an interested party, investigate the rate. 49 U.S.C. § 10707(a). In limited circumstances, the ICC may suspend the rate pending its investigation. *Id.* 10707(c)(1).[4] If no person objects to the tariff and the ICC does not initiate an investigation, the tariff takes effect.

In the case at hand, the defendant railroads collectively fixed a rate plan without conforming to the notice and hearing procedure required by the Agreement. That joint action was prompted in 1976 when the ICC held that the railroads' existing plan for wheat freight rates from Chicago to the east illegally discriminated against cargo shipped to Chicago by motor carrier.[5] *Board of Trade of the City of Chicago v.*

*Akron,* 352 I.C.C. 881 (1976). The Eighth Circuit affirmed the ICC's holding of illegality. *Atchison, Topeka & Santa Fe Railway Co. v. United States,* 549 F.2d 1186 (8th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 223, 54 L.Ed.2d 154 (1977). In response to the ruling, the railroads proposed Plan A for wheat freight. Plan A would have eliminated all proportional rates on wheat shipments, thereby putting all wheat shipments on a flat rate basis. A flat rate is generally higher than a proportional rate.[6] The ICC suspended Plan A and initiated an investigation. During the ICC investigation of Plan A, the railroads withdrew Plan A from consideration and filed Plan B with the ICC, the rate structure now in issue. Plan B differentiated rates between transit and nontransit shipments. A transit shipment is one in which the shipment is interrupted while the shipped goods are taken off the carrier for storage or processing and then returned to a carrier to proceed to their destination. A nontransit shipment reaches its destination without interruption.

Under Plan B, all transit shipments of wheat were to be charged a flat rate and all nontransit shipments, a proportional rate. Previously, the railroads had accorded shippers a transit privilege that enabled shippers to use the through rate from origin to final destination and pay a transit charge for taking the goods off the carrier and replacing them. The transit privilege applied for both proportional and flat rate

---

**4.** The ICC may suspend a rate when
(A) it is substantially likely that the protestant will prevail on the merits;
(B) without suspension, the proposed rate change will cause substantial injury to the protestant or the party represented by the protestant; and
(C) because of the peculiar economic circumstances of the protestant, the provisions of subsection (d) [providing for a refund] of this section do not protect the protestant.
49 U.S.C. § 10707(c)(1).

**5.** The rate structure then in existence charged a flat rate for wheat shipments from Chicago which had arrived in Chicago by motor carrier and a proportional rate for wheat which had arrived in Chicago by barge, lake vessel, or rail.

See *Board of Trade of City of Chicago v. ICC,* 646 F.2d 1187, 1189 (7th Cir.1981).

**6.** A flat rate is "[a] local rate of a single carrier or a joint rate of two or more carriers published as a unit and not dependent for application on any previous or subsequent transportation." Transit on Wheat Between Reshipping Point and Destination, 362 I.C.C. 529 n. 1 (1980). A proportional rate is based on "a percentage and/or differential over or under the Chicago to New York rate. The rates from other origins in official territory historically were made as a percentage of the Chicago flat rates, and the origin areas were given group numbers reflecting the percentage of the Chicago rates." Id. at 530.

shipments. According to Plan B, however, the transit privilege was eliminated for proportional rate shipments. If a shipper chose a proportional rate for a transit shipment, that rate would apply only to the intermediate transit destination. Once the shipment was interrupted, a flat rate would apply to the remainder of the journey. Only if the shipper chose the higher flat rate did Plan B permit him to apply the through rate.

The railroad adopted Plan B without giving public notice or holding a hearing as required by the Agreement. Plan B was then filed with the ICC. Upon complaint by the shippers, the ICC initiated an investigation of Plan B. The ICC rejected the shippers' request to have Plan B suspended, pending investigation, however. *Transit on Wheat Between Reshipping Point and Destination*, No. 37146 (March 16, 1979) (*Transit on Wheat I*). The protestants before the ICC, the Chicago Board of Trade and some shippers,[7] made substantive challenges to Plan B as well as the procedural challenge that the railroads had not complied with the notice and hearing requirements.[8] The railroads argued that they were excused from the procedural requirements because Plan B grew out of the ICC decision holding the existing rate structure invalid. Also, the railroads argued that Plan B was of an emergency nature because of the previous ICC decision.

On January 16, 1980, the ICC approved Plan B. *Transit on Wheat Between Reshipping Point and Destination*, 362 I.C.C. 529 (1980). (*Transit on Wheat II*). The ICC rejected the railroads' contention that their conduct in adopting Plan B fell within the exceptions to the notice and hearing requirements of the Agreement. First, the ICC decided that the 1979 proposal could not be deemed an emergency ac-

tion when it responded to the 1976 ICC decision. *Id.* at 562. Additionally, the ICC ruled that the decision to eliminate transit on proportional rates did not grow out of the ICC decision holding the previous tariff to discriminate against motor carrier traffic. *Id.* The ICC nevertheless excused compliance with the Agreement because the exceptions in the Agreement were vaguely worded and the protestants had at least received constructive notice of Plan B when it was filed with the ICC. *Id.* at 563. Therefore, the ICC held that the tariff schedules under Plan B were lawful. *Id.* at 564.

The protestants appealed the ICC decision to the Seventh Circuit, which reversed the finding of the ICC. The Seventh Circuit held that if the railroads did not comply with the Agreement procedures and were not exempt from complying by an exception provided for in the Agreement, then the ICC could not approve the proposal. *Board of Trade of City of Chicago v. ICC*, 646 F.2d 1187, 1189, 1191–93 (7th Cir. 1981). The court explained the importance of adhering to the terms of the Agreement:

> Section 5b represents a congressional "accommodation of the differing policies embodied in the antitrust laws and in the Interstate Commerce Act, particularly in furtherance of the national transportation policy." *Eastern Railroads—Agreements*, 277 I.C.C. at 280. The national transportation policy condemns cutthroat competition among carriers; joint action by the railroads on rates, and antitrust immunity for such action, is therefore, necessary. *Western Traffic Association—Agreement*, 276 I.C.C. [183] at 188. To diminish the possibility of harm to shippers inherent in that plan, however, the *Agreement*, sanctioned by section 5b, provides for the orderly consideration of rates and an opportunity

---

7. The shippers who appeared as protestants before the ICC were General Mills, Inc., Peavey Co., The Pillsbury Co., International Multifoods Corp., and the Minneapolis Grain Exchange.

8. The protestants argued that the tariff discriminated in favor of shippers who took transit west

of Chicago and against those shippers who took transit east of Chicago and would be charged that flat rate for taking transit and that the tariff schedules violated merger conditions imposed on some of the railroads.

for the affected shippers to be heard as a prerequisite to antitrust immunity. In this case, the ICC, by condoning the railroads' circumvention of the *Agreement,* upset the congressional balance. 646 F.2d at 1193. The court remanded the case to the ICC.

The ICC invited further briefing on the issues of whether the railroads had complied with the notice and hearing procedures and, if not, whether their conduct fell into the Agreement's exceptions. On July 20, 1982, the ICC held that the railroads had violated the Agreement by failing to conform to its procedures and by failing to satisfy the exceptions to those procedures. The tariff was ordered cancelled within 30 days. *Transit on Wheat Between Shipping Point and Destination,* 365 I.C.C. 890 (1982). (*Transit on Wheat IV* ).[9] None of the parties appealed that decision.

The plaintiffs then filed these suits alleging that the defendants' conduct in fixing the tariff violated the antitrust laws. Plaintiffs argue that since the defendants violated the Agreement, they were no longer entitled to immunity from the antitrust laws under § 10706(a)(2)(A). Hence their collective activity in fixing the rate structure constitutes, plaintiffs contend, a per se violation of the Sherman Act. Now before us are various motions by plaintiffs and defendants for summary judgment and for ruling on a collateral estoppel issue and the issue whether the defendants' activities, if not exempt, constitute per se violations of the antitrust laws.

### 1. *Exclusive Jurisdiction*

Among the grounds for defendants' motion for summary judgment is the exclusive jurisdiction of the ICC. Whether a federal court has jurisdiction to determine liability under the antitrust laws for the conduct alleged to have occurred here or whether the ICC has exclusive jurisdiction over the conduct involved is the first issue to be decided. The defendants argue that because the Interstate Commerce Act establishes a pervasive system of regulation by the ICC over railroads, the plaintiffs' exclusive remedy lies before the ICC. In other words, the defendants contend that no antitrust claim can arise out of defendants' actions since those actions are extensively regulated by the ICC.

In *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) the Supreme Court explained when an antitrust remedy was available as an alternative to remedies available under regulatory acts. An antitrust remedy exists as "long as the courts refrain from taking action which might interfere with the [regulatory agency's] exercise of its lawful powers." *Id.* at 221, 86 S.Ct. at 786. Applying that test to the facts of this case, we conclude that the ICC does not have exclusive jurisdiction so as to preclude an antitrust suit.

*Carnation* involved the interplay between the Shipping Act and the antitrust laws. Like the Interstate Commerce Act, the Shipping Act confers antitrust immunity for implementing rate making agreements which a regulatory agency approves. The Federal Maritime Commission has such authority under the Shipping Act. The plaintiff in *Carnation* charged that the defendant, a rate conference among shipping companies, carried out a rate making agreement which the Maritime Commission had not approved. Rate increases for transporting milk from the east coast to the Philippines took effect pursuant to the unapproved agreement. The defense to the suit was that the rate increases were passed pursuant to an earlier agreement which the Maritime Commission had approved. Whether the rate increases resulted from the approved agreement or the unapproved agreement was the subject of a proceeding then pending before the Maritime Commission. The Court ordered the antitrust action stayed while the proceedings were before the Maritime Commission, but concluded that the plaintiff's allegations were actionable under the antitrust laws because any action a court took on the

---

**9.** We have labeled a chronologically earlier decision *Transit on Wheat III.* See Section 2 *infra.*

antitrust claims would not interfere with the Maritime Commission. "The award of treble damages for past and completed conduct which clearly violated the Shipping Act would certainly not interfere with any future action of the Commission." *Id.* at 222, 86 S.Ct. at 787.

■ As in *Carnation*, our action in this suit will have no impact upon the ICC's workings. In fact, the possibility of interference with the ICC is even more remote than in *Carnation* because here the ICC proceedings are entirely completed. We need not even stay our hand while the ICC determines whether the defendants complied with the approved Agreement. Rather, we already have before us the ICC's final determination that defendants violated the Agreement. The issues the ICC decided—whether defendants complied with the approved agreement and whether any exception provided for in the agreement exempted them from complying—are issues we will not even consider, for the ICC's determination is final and the parties to it[10] are collaterally estopped from challenging it. *See In re Wheat Rail Freight Rate Antitrust Litigation*, 579 F.Supp. 510 MDL No. 534 (N.D.Ill. Dec. 8, 1983) (Pretrial Order No. 26 granting in part and denying in part plaintiffs' motions with respect to collateral estoppel). Our use of the ICC's conclusions should not, therefore, interfere with how the ICC addresses similar issues in the future. In refusing to dismiss the complaint, the Court in *Carnation* stated that the plaintiffs' rights "under the antitrust laws are entirely collateral to those which petitioner might have sought under the Shipping Act." *Id.* 383 U.S. at 224, 86 S.Ct. at 787.

The cases on which defendants rely for the proposition that no antitrust remedy is available because the ICC has jurisdiction over the conduct in question differ from this case in two important respects. First, in those cases, the ICC either had not considered the conduct in question or had approved the conduct in question. Any decision by a court therefore would inevitably interfere with the commission's role. Second, the conduct in question was conduct which the commission was empowered to approve and of the sort the regulatory act had permitted. To allow an antitrust action based on conduct which the act recognized as necessary would result in two colliding regimes. *Pan American World Airways v. United States*, 371 U.S. 296, 310, 83 S.Ct. 476, 485, 9 L.Ed.2d 325 (1963). *Pan American* is among the cases cited by defendants. There the United States prosecuted Pan American and W.R. Grace & Co. for forming a company, Panagra, to which the exclusive traffic to the West Coast of South America was to be granted and for conspiring to monopolize air commerce between the United States and South America. Because the Civil Aeronautics Board had authority under the Civil Aeronautics Act and the Federal Aviation Act over consolidation, merger, purchase, acquisitions, and limitations of routes and division of territories, the formation of Panagra and the division of routes were "precise ingredients of the Board's authority." 371 U.S. at 305, 83 S.Ct. at 482. The board had authority over these areas yet the board had never been presented with the issues. The Court concluded that the "Board should decide whether these particular transactions should be undone in whole or in part, or whether they should be allowed to continue." *Id.* at 311, 83 S.Ct. at 485.

In *United States Navigation Co. v. Cunard Steamship Co.*, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932), another case cited by defendants, the plaintiff, a steamship operator, challenged defendant corporations' offer of special rates to those who agreed to use only defendants' steamship lines. The Maritime Board had authority over the defendants' rate setting conduct under the Shipping Act, but the plaintiff had not challenged defendants' conduct be-

10. The decision applied in favor of those plaintiffs before us who were not parties to the ICC proceeding as well. *In re Wheat Rail Freight Rate Antitrust Litigation*, 579 F.Supp. 510, 510 n. 1 (N.D.Ill.1983).

fore the board. The Supreme Court held that the complaint should be dismissed:

> Congress undoubtedly intended that the board should possess the authority primarily to hear and adjudge the matter. For the courts to take jurisdiction in advance of [the board's] hearing and determination would be to usurp that authority. Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement may be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications.

*Id.* at 487, 52 S.Ct. at 251.

Defendants also refer to *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). There TWA's complaint charged that Hughes, its parent corporation, controlled TWA's acquisition of aircraft and necessary financing. Every acquisition had been approved by the Civil Aeronautics Board. The conduct in question was within the board's jurisdiction to approve. The Court dismissed the suit:

> We by no means hold that the Federal Aviation Act completely displaces the antitrust laws. But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where the CAB specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws.

*Id.* at 389, 93 S.Ct. at 661.

■ In this case, the two factors present in the cases discussed which the Supreme Court has found to warrant dismissal are absent. The Seventh Circuit has refused to apply these cases to bar an antitrust action based on regulated conduct on similar grounds. *MCI Communications v. American Telephone & Telegraph Co.,* 708 F.2d 1081 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). There, the Seventh Circuit compared its case with *Pan American Airways* and *Hughes Tool:*

> In the instant case, by contrast, neither AT & T's interconnection decisions nor its price structure policies are dictated, in the first instance, by the FCC (although, of course, AT & T's overall rate of return is subject to continuing surveillance). Moreover, to the extent that any FCC decisions are relevant to AT & T's claim of implied immunity, those decisions disapprove of, rather than condone AT & T's actions. Thus, this is not a case like *Hughes Tool* or *Pan American Airways,* where the refusal to grant antitrust immunity could subject AT & T to conflicting and potentially irreconcilable liability standards.

*Id.* at 1103. As in *MCI,* the ICC has disapproved of the conduct in question. The time for appealing the ICC decision has expired. As importantly, the ICC has no power to approve what the defendants did, i.e. violate the Agreement. *Board of Trade,* 646 F.2d at 1193. Defendants' motions for summary judgment upon the ground that the Interstate Commerce Commission has exclusive jurisdiction of this action are denied. We conclude that this antitrust suit is properly before us.

### 2. *Election of Remedies*

Related to the issue of exclusive jurisdiction is the question whether those plaintiffs who sought reparations before the ICC are barred from seeking antitrust damages by an election of remedies. The defendants argue that General Mills, Pillsbury, and certain members of the class sought damages before the ICC and are therefore precluded from seeking damages here. The relevant plaintiffs argue that they did not seek reparations before the ICC and that since the ICC lacks power to award antitrust damages, that any action before the ICC does not bar plaintiffs' efforts here.

In *Terminal Warehouse Co. v. Pennsylvania Railroad Co.,* 297 U.S. 500, 56 S.Ct.

546, 80 L.Ed. 827 (1926), the Supreme Court held that the plaintiff, who had unsuccessfully sought reparations before the ICC, could not recover in an antitrust suit. The Court stated that

> Petitioner, not satisfied to proceed under the Commerce Act, put that remedy aside and brought suit under the Sherman and Clayton Acts, hoping by that manoeuvre to charge both carrier and warehouse, and to charge them with treble damages. Every act of wrongdoing proved in the new suit to have been committed by the defendants was proved against them also (with unsubstantial exceptions) in the case before the Commission. Now as before, the head and front of their offending is the use of the warehouses as stations for the carrier with the allowances and privileges, such as exemptions from demurrage, growing out of that relation. What is true of the offense is true also of its consequences. There has been no proof of any loss that would not be provable in equal measure in proceedings under the Commerce Act upon a claim for reparation.

*Id.* at 509, 56 S.Ct. at 549.

*Terminal Warehouse* arose in a different statutory context than that in existence here. *Terminal Warehouse* preceded the Reed-Bullwinkle Act, (currently codified at 49 U.S.C. § 10706) which granted limited antitrust immunity, so antitrust actions based on conduct subject to ICC regulation were held not actionable under the *Keogh* doctrine.[11] Although *Terminal Warehouse* preceded the Reed-Bullwinkle Act, its election of remedies holding has been repeated since the passage of the act. For example, in *Ellingson Timber Co. v. Great Northern Railway Co.*, 424 F.2d 497 (9th Cir.1970), the court held the plaintiff barred from seeking damages under the antitrust laws because it had unsuccessfully sought damages before the ICC. The court refused to award damages on two grounds. First, "submission of this issue to the Commission in support of a claim for

reparations constituted an election of remedies; and plaintiff is bound by the election even though it is now dissatisfied with the remedy it chose." *Id.* at 498. Also, the plaintiff's injury in *Ellingson* resulted from conduct which the ICC had found lawful as opposed to that conduct which the ICC had invalidated and on which the suit was based.

*Carnation Co. v. Pacific Westbound Conference* also made reference to the election of remedies doctrine. There the Court held that a shipper could maintain an antitrust action even though it had proceeded first before the Federal Maritime Commission. The shipper had not requested damages before the commission, so the Court concluded that the plaintiff could still maintain its antitrust suit. The Court cautioned that the same would not be the case had the shipper sought reparations before the ICC:

> Petitioner's failure to seek Shipping Act reparations does not affect its rights under the antitrust laws. The rights which petitioner claims under the antitrust laws are entirely collateral to those which petitioner might have sought under the Shipping Act. This does not suggest that petitioner might have sought recovery under both, but petitioner did have its choice.

383 U.S. at 224, 86 S.Ct. at 787.

The court in *Consolidated Express, Inc. v. New York Shipping Association*, 602 F.2d 494 (3d Cir.1979), *vacated on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980) also involved the election of remedies doctrine. There the plaintiff had filed complaints for damages before the Federal Maritime Commission. The complaints were voluntarily withdrawn when the antitrust suit was filed before any proceedings on the merits had occurred before the commission. The court decided that the case could proceed and that the plaintiff's complaints before the Maritime

---

**11.** *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) held that a shipper could not sue a carrier for antitrust violations based on rates which the ICC had approved as reasonable. See Section 4 *infra* for discussion of *Keogh*.

Commission did not constitute an election of remedies. The court stated:

> The appellees would have us read [*Carnation*] as establishing a rule that the FMC filing was an irrevocable election of remedies. But Chief Justice Warren neither said nor suggested any such rule, and no considerations of policy support it. The purposes of an election of remedies—prevention of double recovery, forum shopping, and harassment of defendants by dual proceedings—are adequately served by a rule that plaintiffs may not pursue both their Shipping Act and Clayton Act claims to a decision on the merits.

602 F.2d at 525.

██ We conclude that the approach of *Consolidated Express* is correct. One who requests reparations and has pursued his claim before a regulatory body has elected his remedy, and though unsuccessful before the regulatory body, he is precluded from seeking a different remedy before a court based on the same conduct. Granted, reparations from the ICC are of a different nature than treble damages under the antitrust laws, for the policies underlying the two laws obviously differ. Nevertheless, had plaintiffs sought and recovered reparations before the ICC, recovery of treble damages would have been duplicative. The fact that plaintiffs failed to recover reparations should not alter the fact that they elected a remedy under the Interstate Commerce Act if in fact plaintiffs actually sought reparations. It is necessary then to determine exactly what plaintiffs sought and pursued to final determination before the ICC to determine whether they in fact elected their remedy.

To determine what the plaintiffs requested before the ICC, we look first to the plaintiffs' submissions to the ICC. Not all the plaintiffs here participated in the proceedings before the ICC. And not all of the record before the ICC has been submitted to us. We have the Petition of Peavey Co., the Pillsbury Co., International Multifoods Corp., and the Minneapolis Grain Exchange for Entry of an Order in

Conformity with the Opinion of the United States Court of Appeals for the Seventh Circuit. That is the only document in which we can find a request by plaintiffs for reparations from the ICC. In that petition, the petitioners state:

> [N]othing remains but for the Commission to enter an order requiring the carriers to cancel and withdraw those provisions of the tariffs under investigation which cancelled the availability of transit arrangements on the proportional rates and which were published in violation of the carriers' approved section 5b procedures, require the respondent railroads to report all amounts received as a result of the application of the schedules specifying by whom and in whose behalf the amounts were paid and order a refund to those shippers for the excess charges resulting from the application of the schedules in question.

*Id.* at 6. The ICC responded to the petition by reopening proceedings on Plan B. The issues to be addressed were whether the railroads had complied with the approved agreement and if not whether they were excused from complying with the agreement. In its order, the ICC stated, "We believe that protestants seeking reparations here should be required to show that because of the violation of the agreement procedures, they were injured by a defined amount." *Transit on Wheat Between Reshipping Point and Destination* No. 37146 at 5 (December 8, 1981) (*Transit on Wheat III*). The ICC then invited comment on an appropriate remedy.

The petitioners' next submission to the ICC did not specifically request reparations. Rather, they stated "we submit that the Interstate Commerce Commission now has an obligation to insist on this compliance with the terms and conditions of its original order in this matter, and that respondent railroad be ordered to produce their accounting accordingly." Response of Peavey Company, the Pillsbury Company, International Multifoods Corporation and General Mills, Inc., to the Commission's Decision Dated December 8, 1982 at

4, 5. In its final decision, which neither side appealed, the ICC stated:

> Although it is not altogether clear, it appears that protestants would have us award reparations based on the excess above what the shippers would have paid without the transit restriction. That is, shippers would get the lower proportional rates, rather than the higher combination rates on those movements that were afforded transit following implementation of the tariff. Several shippers presented claims ....

*Transit on Wheat IV,* 365 I.C.C. at 898. The ICC then listed each of the four shippers who had presented a fixed figure of alleged damages and the figure claimed. The court then concluded that an award of reparations was inappropriate.

■ Defendants have moved for summary judgment on the ground of election of remedies against those plaintiffs who participated in the ICC proceeding. Those plaintiffs assert that they never sought reparations before the ICC. With the documents we now have before us, a genuine issue of fact exists as to whether plaintiffs requested reparations. The only time the plaintiffs specifically requested a refund was in their first submission to the ICC following the Seventh Circuit decision. In response to that petition, the ICC requested further briefing on several issues, including the appropriate remedy. Yet in the petitioners' next submission to the ICC, when they were supposed to be addressing the issue of the appropriate remedy, they requested an accounting, not a refund. Even the ICC noted that what the petitioners sought was unclear. As to those plaintiffs who did not take part in the ICC proceeding, summary judgment is clearly unwarranted on an election of remedies theory. Summary judgment is also inappropriate on the present record as to those who did take part in the ICC proceeding. Accordingly defendants' motions for summary judgment upon the ground of election of remedies are denied.

### 3. *Express Immunity*

■ The defendants argue that their conduct is expressly immune under 49 U.S.C. § 10706(a)(2)(A). That section grants limited immunity for railroads to carry out agreements that have been approved by the ICC. Here, the defendants did not carry out the Agreement that the ICC had approved but rather violated it. Section 10706 cannot, therefore, excuse their conduct from the reach of the antitrust laws. To extend immunity beyond the specific situation called for in the act would circumvent the antitrust laws without furthering the national transportation policy. About a similar provision in the Agricultural Act, the Supreme Court has said, "explicit provisions requiring official participation and authorizations show beyond question how far Congress intended that the Agricultural Act should operate to render the Sherman Act inapplicable. If Congress had desired to grant any further immunity, Congress doubtless would have said so." *United States v. Borden Co.,* 308 U.S. 188, 201, 60 S.Ct. 182, 189, 84 L.Ed. 181 (1939). The Interstate Commerce Act does not immunize the defendants' conduct from the antitrust laws. Defendants' motions for summary judgment on the ground of express immunity are denied.

### 4. *Implied Immunity*

Defendants next argue for summary judgment on the ground that their conduct is immune from the antitrust laws under *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In *Keogh,* the Supreme Court refused to permit a private antitrust suit for damages based on a combination to fix rates that had been approved as reasonable by the Interstate Commerce Commission.

In determining whether the conduct in issue here is impliedly exempt from the antitrust laws, we are guided by *MCI Communications v. American Telephone & Telegraph Co.* There the court of appeals decided that AT & T's conduct in setting prices and requiring AT & T interface de-

vices was not impliedly immune even though both practices had been filed as tariffs with the FCC. The court began its analysis of the implied immunity issue by recognizing that immunity not expressly granted by statute is the exception to the rule:

> It is well-established ... that regulated industries "are not *per se* exempt from the Sherman Act." *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439 [65 S.Ct. 716, 89 L.Ed. 1051] ... (1945). "Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange*, 422 U.S. 659 [95 S.Ct. 2598, 45 L.Ed.2d 463] ... (1975) (quoting *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51 [83 S.Ct. 1715, 1734, 10 L.Ed.2d 915] ... (1963)). As a further limitation, repeal is to be regarded as implied only where necessary to make the regulatory scheme work, and even then, only to the minimum extent necessary. *Silver v. New York Stock Exchange*, 373 U.S. 341, 357 [83 S.Ct. 1246, 1257, 10 L.Ed.2d 389] (1963).

708 F.2d at 1102.

■ Given this presumption against implied immunity, "the specific regulatory scheme involved and the administrative authority exercised pursuant to that scheme" must be evaluated to determine whether immunity is implied. The evaluation must consider

> (1) whether the activities that are the subject of MCI's complaint were required or approved by the Federal Communications Commission, pursuant to its statutory authority, in a way that is incompatible with antitrust enforcement, ... or (2) whether these activities are so pervasively regulated "that Congress must be assumed to have forsworn the paradigm of competition."

*Id.* at 1102 (citations omitted). The court analyzed both of these factors as to the interconnection tariff and then as to the price tariff.

As to the interconnection tariff, the FCC had never controlled or approved of AT & T's conduct. Nor had the FCC so closely supervised the interconnection practices that approval could be inferred. Also, because the FCC had actually encouraged competition in the telecommunications field, the goals of the Communications Act and competition were compatible. In passing the Communications Act, Congress had not abandoned the goal of competition. The court decided that AT & T did not enjoy implied immunity for its interconnection tariff. *Id.* at 1104.

The court next analyzed the pricing tariff filed by AT & T. The court recognized that although the FCC has authority over rates, the Communications Act gives the carrier sole responsibility for filing the tariff on rates and permits the carrier to file new rates at any time. Once a tariff is filed, it automatically takes effect 90 days after it is filed unless the FCC takes action on the tariff. AT & T therefore has "primary responsibility for initiating and setting both regular and private line telephone rates." *Id.* at 1104. The mere fact that a tariff takes effect, then, does not mean that the FCC has actually approved it. The court decided that the price tariffs were not impliedly immune. "[W]here, as here, the pricing decisions complained of are more the result of business judgment than regulatory coercion, and the FCC has neither dictated nor approved of those decisions, the challenged rate filings are not immune from antitrust scrutiny." *Id.* at 1105.

■ Although the Interstate Commerce Act differs from the Federal Communications Act, the analysis in *MCI* applies to this case. Unlike the Communications Act, the Interstate Commerce Act provides limited express immunity. That distinction does not preclude application of the *MCI* analysis to this case, for the facts here fall outside the express immunity under the statute. The other distinction between the acts is that the ICC, since the

passage of the Railroad Revitalization and Regulatory Reform Act (4 R Act), lacks the authority to determine whether rates are reasonable, except when the railroad has market dominance.[12] Both of these distinctions weigh somewhat against implying immunity in this case. If Congress has actually addressed the issue of immunity and has provided immunity in given circumstances, conduct falling outside those circumstances ought not to be immune absent compelling policy considerations. Further, the fact that the ICC no longer has the power to review the reasonableness of rates means the regulation is less pervasive than in *MCI*, at least with respect to the rates. With these considerations in mind, we shall apply the factors mentioned in *MCI* to the instant case. Under *MCI* we must decide whether the regulatory agency had exercised its authority over the practice in question by approving it and whether the activities in question are so pervasively regulated that Congress must have abandoned the goal of competition. 708 F.2d at 1102.

■ The latter inquiry is more easily answered. Congress has expressly affirmed the ideal of competition in both the Reed-Bullwinkle Act and the 4 R Act. As the House of Representatives report on the Reed-Bullwinkle Act stated, "The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to such joint agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body." H.R.Rep. 1100, 80th Cong., 2d Sess. 4, *reprinted in* 1948 U.S.Code Cong. & Ad.News 1844, 1848. In drafting the Reed-Bullwinkle Act, Congress intended that the antitrust laws and the Interstate Commerce Act be compatible.

In the 4 R Act, Congress enumerated among the purposes of the Act "to allow, to the maximum extent possible, competition and the demand for services to estab-

lish reasonable rates for transportation by rail." 49 U.S.C. § 10101a(1). Another goal listed was "to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required." *Id.* § 10101a(2). Congress has not foresworn the paradigm of competition among carriers.

The other inquiry required by *MCI* is whether the regulatory agency had approved the conduct in question. In this case, the ICC approved the conduct in question, but the ICC's decision was appealed and reversed. In the same action in which the ICC approved the tariff, the ICC eventually rejected the tariff in a decision which is now final. Whether the initial decision to approve conduct impliedly immunizes that conduct even if the decision is ultimately reversed is a question no court has answered. In considering the instant agreement, in the *Board of Trade* case, however, the Seventh Circuit suggested that the ICC approval, whether final or not, indeed immunized the conduct in question:

> Monitoring by the ICC of the observance of the *Agreement* is essential to the enforcement of section 5b. If the procedures are not followed but the ICC nevertheless approves the rate, although section 5b does not render the rate immune from the antitrust laws because the *Agreement* has not been carried out; the ICC approval itself shelters the joint rates from private suit under the antitrust laws. If the Commission has found that the rates are reasonable and nondiscriminatory, a private shipper cannot recover under the antitrust laws for damages caused by loss of the benefit of rates still lower which but for the conspiracy he would have enjoyed. *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156 [43 S.Ct. 47, 67 L.Ed. 183] ... (1922). In other words, even if the conference procedures, which Con-

---

**12.** The ICC found the defendants did not have market dominance. Transit on Wheat I, 362

I.C.C. at 555.

gress considered necessary to justify immunity from the antitrust laws, are not followed, antitrust immunity inures if the ICC fails to correct that noncompliance but approves the rate. Therefore, to prevent frustration of the congressional purpose, unless the ICC finds that the 5b procedures were followed or were not applicable because of an exception to the *Agreement,* the ICC must find that the tariff schedule is unlawful and in violation of 49 U.S.C. § 10706(a)(2)(A).

646 F.2d at 1193.

The above dicta from *Board of Trade* relies on *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). To understand and to answer the remaining inquiry in *MCI,* a review of *Keogh* and the cases that have interpreted *Keogh* is necessary. In *Keogh* the Supreme Court did not allow a suit brought by an excelsior and flax tow manufacturer in St. Paul, Minnesota against carriers who transported goods from St. Paul. The defendant carriers had formed the Western Trunk Line Committee whose function it was to set freight rates. Keogh alleged that the defendants had conspired to fix excessive rates causing him to lose profits. The rates in question had all been filed with the ICC, suspended, investigated, and approved by the ICC before taking effect. The Court held that a private shipper could not maintain an action based on rates approved by the ICC.

Various factors influenced the Court's decision. First, the rates were legal and had been approved by the ICC. 260 U.S. at 161, 43 S.Ct. at 49. If the rates had been discriminatory or unreasonably high, Keogh's remedy would be under the Act to Regulate Commerce (now the Interstate Commerce Act), not under the antitrust laws. *Id.* at 162, 43 S.Ct. at 49. Also, to allow Keogh's suit would give him a preference over other shippers who did not join in the suit, thus defeating the policy of uniformity under the Act to Regulate Commerce. *Id.* Even if all injured shippers sued, uniform recovery by all would be an unlikely result. *Id.* The Court reasoned

further that Keogh could not prove the elements of his case. To recover, he would have to prove not only that absent a conspiracy, lower rates would have been charged, but also that the hypothetical lower rates would have been nondiscriminatory under the Act to Regulate Commerce. *Id.* at 163–64, 43 S.Ct. at 49–50. Because the ICC had primary authority to determine whether a rate was legal but lacked authority to determine whether a hypothetical rate was legal, Keogh could not get a finding of illegality from the ICC. *Id.* at 163–64, 43 S.Ct. at 49–50. Finally, the Court was concerned that the alleged damages were purely speculative. Since all carriers were required by law to charge the rate at issue, Keogh could not prove that he had been damaged at all, let alone the extent of his damages.

> Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him. Every competitor was entitled to be put—and we must presume would have been put—on a parity with him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him.

*Id.* at 165, 43 S.Ct. at 50.

In recent years, the courts have found ways to avoid applying *Keogh* to bar antitrust action, but *Keogh* has never been rejected in cases in which the conduct in question had actually been approved by a regulatory body.

Two cases arising out of one set of facts illustrate how the courts have tended to distinguish *Keogh* in recent years. In 1968, the Federal Communications Commission (FCC) ruled that tariffs preventing customers from attaching equipment not

produced by AT & T were invalid. *In re Use of the Carterfone Device*, 13 F.C.C.2d 420 (1968). In response to that determination AT & T filed with the FCC another tariff which permitted customers to attach competitors' equipment only with an AT & T produced interface device. The FCC permitted the tariff to take effect but reserved judgment on whether the tariff was valid. Eventually, in 1975, the FCC eliminated the existing tariff and replaced it with a tariff requiring equipment to be registered with the FCC rather than requiring AT & T interface devices.[13]

Litton Systems, Inc., a competitor of AT & T, sued AT & T based on the 1968 tariff in *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785 (2d Cir.1983), *petition for cert. filed*, 52 U.S. L.W. 3001 (U.S. June 28, 1983) (No. 82–2128). The court permitted the antitrust suit to proceed. It distinguished *Keogh* on two grounds. First, the issue in *Litton* was not the reasonableness of rates, but rather whether there should have been any charge at all, i.e., whether customers should have been required to use AT & T interface devices. Hence no inconsistency existed between the operation of the antitrust laws and the regulatory scheme which determined reasonable rates. Second, the FCC had disapproved of the tariff: "the *Keogh* doctrine is inapplicable to ultimately 'disapproved tariffs ... when ... the regulatory agency expressly refuses to commit itself pending investigation.'" *Id.* at 820 (quoting *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.1981).

A case involving the same AT & T tariff, *Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 610 F.2d 1114 (3d Cir.1979) also declined to apply *Keogh* as a bar to an antitrust suit.

*Keogh* did not apply, the court said, because in *Keogh*, the antitrust action had been brought by a customer of the defendant and in *Essential Communications*, the action had been brought by a competitor. Also, the FCC had withheld approval of the tariff, so the antitrust suit would not interfere with the regulatory scheme.

In addition to the above cases involving a tariff filed with the FCC are two cases involving tariffs filed with the Federal Energy Regulatory Commission which also refused to apply *Keogh* to bar antitrust suits. *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981) was an antitrust suit based on tariffs filed with the Federal Power Commission (now the Federal Energy Regulatory Commission). The court there explained *Keogh*'s rationale: "the regulatory agency determines the legal rate and the utility must collect it while it is in effect." *Id.* at 929. The court refused to apply *Keogh* because the suit was brought by municipalities which were competitors as well as customers and because the FPC had disapproved of some of the provisions in question.

*City of Kirkwood v. Union Electric Co.*, 671 F.2d 1173, 1178 (8th Cir.1982) also refused to use *Keogh* as a bar to an antitrust action. The case involved a price squeeze on a municipality by a power company. Again the rate in question had been filed with the FERC. The court distinguished *Keogh:* "The filed-rate doctrine does not preclude antitrust liability in the case at bar. An award of antitrust damages for a price squeeze would not conflict with the doctrine's purpose, which is to ensure rate uniformity by confining the authority to oversee the reasonableness of rates to a single regulatory agency." *Id.* at 1179.

---

**13.** Numerous cases permitted antitrust actions to proceed against AT & T based on the interface tariff without even mentioning *Keogh: Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *MCI Communications v. American Telephone & Telegraph Co.*, 708 F.2d 1081, discussed in Section 4 of this opinion;

*Phonotele, Inc. v. American Telephone & Telegraph Co.*, 664 F.2d 716 (9th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *Mid-Texas Communications Systems v. American Telephone & Telegraph Co.*, 615 F.2d 1372, 1377–82 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Sound Inc. v. American Telephone & Telegraph Co.*, 631 F.2d 1324, 1327–31 (8th Cir.1980).

Two cases refused to apply *Keogh* in the context of ICC regulation. *Clipper Exxpress v. Rocky Mountain Motor Tariff,* 690 F.2d 1240 (9th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) involved facts very different from those in *Keogh.* In *Clipper Exxpress,* it was the plaintiff that had filed the rate in question with the ICC. The plaintiff, an ICC regulated freight forwarder, sued ICC regulated trucking companies and rate bureau. The plaintiff had filed a tariff with the ICC reducing its rates, and the defendants had protested the new tariff. Because the rates were suspended pending the ICC investigation, the plaintiff had to charge the earlier, higher rates. Consequently, its business suffered. The defendants argued that *Keogh* barred the suit because the suit was based on approved rate structures, those in effect during the suspension of the proposed rates. The court reviewed the factors mentioned in *Keogh* and concluded that *Keogh* did not bar the suit. The plaintiff's suit included three claims: 1) the cost of defending the protests; 2) lost profits because of the cloud on the plaintiff's rate during the investigation; and 3) the defendants' protests prevented the plaintiff from filing a third further reduced rate. *Keogh* was inapplicable, the court said, because no remedy was available under the Interstate Commerce Act for any of the plaintiff's grievances. Among the premises of *Keogh* was that the Interstate Commerce Act provided a remedy for illegal rates. Also differentiating *Keogh* from *Clipper Exxpress* was that in *Clipper Exxpress,* little speculation was required to determine the rate that would have been charged if the former rate had not been in effect.

> [T]he allegations indicate that Clipper would have filed an $842 rate, and the subsequent ICC approval suggests that rate might have been approved two years earlier. Of course, there is no certainty the rate would have been approved. The speculation involved in the instant case, however, in no way approaches the degree of speculation disallowed in *Keogh.*

*Id.* at 1267. The Court in *Keogh* was concerned that the plaintiff's antitrust suit would require speculation as to what rate would be in effect absent the illegal rate and as to whether the ICC would have approved the hypothetical rate. The court in *Clipper Exxpress* decided that *Keogh* did not bar any of the plaintiff's antitrust claims.

*Transkentucky Transportation Railroad v. Louisville and Nashville Railroad Co.,* 581 F.Supp. 759, (E.D.Ky.1983) refused to apply *Keogh* as a bar to a suit by a coal transporter against various railroads. The plaintiff alleged that defendants had attempted to monopolize transportation of Kentucky coal. The court distinguished *Keogh* because the ICC in *Transkentucky* "merely acquiesced in the pricing decisions made by defendants," *id.* at 63,306, so there existed "no danger that refusal to grant immunity would subject defendants to antitrust liability for conduct expressly approved by a regulatory agency." *Id.* Also unlike *Keogh* was the fact that the complaint was not based on the level of rates, but on a range of exclusionary conduct.

Another case that refused to use *Keogh* as a bar to an antitrust suit was *In re Ocean Shipping Antitrust Litigation,* 500 F.Supp. 1235 (S.D.N.Y.1980), a case involving the Federal Maritime Commission. There, a shipper sued shipping companies alleging that the defendants had fixed prices without following an approved agreement. The court stated "implementation of unapproved agreements, including activities involving the establishment of rates that are filed as tariffs, is not immune from the antitrust laws." *Id.* at 1241. In addition to the fact that the FMC had not approved the agreement under which the rates in question were promulgated, the court distinguished *Keogh* on the then different roles of the FMC and the ICC. "The FMC wields relatively weak power to supervise tariffs. Unlike in *Keogh* the regulatory agency here has not determined that the challenged rates are reasonable." *Id.*

Two recent cases have favorably discussed *Keogh*. *Asbury Graphite v. Dehyco Co.*, 1981–1 Trade Cas. (CCH) ¶ 63,980 (N.D.Cal.1980) was a suit by a shipper against railroads for fixing rates for transporting furfural residue. The court stated that *Keogh* limited the plaintiff to a proceeding before the ICC. Also, the court held that § 10706 proscribed an antitrust suit.

In *Monticello Heights Inc. v. Morgan Driveway, Inc.*, 1974–2 Trade Cas. (CCH) ¶ 75,282 (S.D.N.Y.1974), the plaintiff, a motor home retailer, sued the defendant transporters of motor homes. The complaint alleged that the defendants, through a rate conference, fixed and stabilized the price of motor home transportation. The ICC had approved the fixed rate. The court stated that *Keogh* precluded suit.[14]

A review of the recent cases discussing *Keogh* leads to the conclusion that none is directly on point. The facts of *Clipper Exxpress* are very different because the basis of the suit was not the filed tariff, but rather the defendants' interference with the plaintiff's attempt to file a new lower tariff. In the remaining cases that refused to apply *Keogh*, the ICC had either disapproved or expressly reserved judgment on the filed tariff. On the other hand where, as in *Monticello Heights* and *Asbury Graphite*, the rates had been finally approved by the ICC, the courts applied *Keogh*. In addition to the regulatory agency's disapproval or inaction on a rate, the courts refusing to apply *Keogh* offered various explanations: that the action had been brought by a competitor rather than by a customer, that reasonableness of rates was not in issue, and that entertaining an antitrust suit would not interfere with the regulatory agency's role.

To determine whether *Keogh* should apply to the instant case, a comparison between the two cases is necessary. First, the current regulatory context differs from that of the time of *Keogh*. The Reed-Bullwinkle Act (now § 10706) created limited express immunity from the antitrust laws.

When *Keogh* was decided, no statutory immunity existed. In addition, in 1976, the 4 R Act was passed eliminating the ICC's power to determine the reasonableness of rates except when the carriers have market dominance.

A further distinction between *Keogh* and this case is that in *Keogh* the conduct in question was the reasonableness of rates while here, it is the failure to follow required procedures. The ICC's action differs as well. In *Keogh* the ICC held that tariff lawful in a decision which became final. Here, the ICC initially held the tariff lawful, but on remand from the court of appeals, held the tariff unlawful.

In *Keogh* the Court worried that recovery by Keogh would operate as a preference over other shippers. Here, the danger of a preference is lessened by the possibility of bringing the suit as a class action. In this action plaintiffs Little Crow Milling Co. and Midstate Mills, Inc. have moved to certify a class of

> all persons other than defendants and their subsidiaries, divisions, and affiliates who paid for the freight carriage of wheat and/or wheat by-products by rail from Chicago and other gateways to eastern destinations from October 1, 1978 to present.

If such a class were certified, the problem of inequality among aggrieved persons would be alleviated.

On the other hand, the current case shares some similarities with *Keogh*. Among the reasons for that decision was that recovery by the plaintiff would require substantial speculation about what the rate would have been absent the alleged violation, whether the ICC would have approved the hypothetical rate, and whether the plaintiff had really suffered any damages as a result of the alleged violation. We are confronted by the same need for speculation. The illegality in this case was not the tariff itself, but the manner in which the tariff was fixed. If the railroads had abided by the Agreement, the same rate may

---

**14.** Why the court barred the suit on the basis of *Keogh* rather than express immunity is unclear.

have been passed and filed. The ICC mentioned this concern in *Transit on Wheat IV:*

> Protestants have made no attempt to establish harm resulting from the carriers' unlawful failure to properly notice their proposed Plan B tariffs. We are not willing to assume that, but for the unlawful procedure followed, shippers would not have been subject to the transit restriction published by the carriers in their Plan B tariffs.

365 I.C.C. at 901.

Only if, after speculation, we concluded that a different rate would have been passed by the railroads could the plaintiffs establish that they had been damaged. Then, as in *Keogh*, we would still have to speculate as to whether the ICC would have approved this other rate and whether on appeal the court of appeals would affirm the ICC's determination.

Also among the premises of *Keogh* was that an adequate remedy for unlawful rates existed through the ICC. "If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings." 260 U.S. at 162, 43 S.Ct. at 49. Similarly, here the ICC could have awarded reparations in the proceeding before it. Reparations would be a different and admittedly less substantial remedy, but still would have been adequate to compensate plaintiffs for defendants' wrongdoing.

Although some differences between this case and *Keogh* exist, some of the same concerns mentioned by the Court there apply here as well. The basic policy beneath all the arguments in *Keogh* was that to allow suit based on rates the ICC had held legal inevitably would have frustrated the purposes of the Act to Regulate Commerce. This concern returns us to the yet unanswered inquiry of *MCI:* "whether the activities that are the subject of [the plaintiff's] complaint were required or approved by the Federal Communications Commission, pursuant to its statutory authority, in a way that is incompatible with antitrust enforcement." The considerations mentioned in *Keogh* and the guidance from the Seventh Circuit in *Board of Trade* lead us to the conclusion that enforcing the antitrust laws in this action is indeed incompatible with the role of the ICC and the policy of the Interstate Commerce Act.

As in *Keogh*, the ICC, at least initially, expressly approved the rate in question. To permit recovery would require much speculation about what tariff would have been in effect had the railroads followed the required procedure. The railroads had the benefit of an alternative remedy before the ICC through a request for reparations. An antitrust suit based on conduct that the ICC had explicitly approved would without question interfere with the policy of the Interstate Commerce Act.[15] If this suit were allowed to proceed, a carrier could never rely on a determination by the ICC. When a rate was filed with the ICC, the carrier would have to wait not only until the ICC reached a conclusion on the rate but until that determination became final either through an appeal or until the time for appeal elapsed before putting the proposed rate into effect. If a carrier relied on the initial determination and implement-

---

15. In a plurality opinion, *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Supreme Court rejected the argument that approval by a state regulatory agency of a utility's conduct immunized that conduct from antitrust liability. In a portion of the opinion joined by the majority of the Court, Justice Stevens stated that the test for immunity by implication should be "at least as severe as those applied to federal regulatory legislation," *id.* at 597, 96 S.Ct. at 3121, but did not expressly say that the test should be more severe. In rejecting the defendant power company's claim of implied immunity, the Court stated, "neither Michigan's approval of the tariff filed by respondent, nor the fact that the lamp exchange program may not be terminated until a new tariff is filed is a sufficient basis for implying an exemption to the federal antitrust laws for that program ...." *Id.* Michigan's regulatory scheme, the Court concluded, did not conflict with the federal antitrust laws. The difference between *Cantor* and the instant case is that here the regulatory and antitrust laws do conflict.

ed the tariff, it would risk treble damages in the event the court of appeals reversed the ICC's ruling. The time during which a carrier would be subject to such a risk could be years. A remedy for the aggrieved shipper is provided for in the Interstate Commerce Act, but it is not tripled and hence does not act as such a drastic deterrent to acting upon the decision of the ICC. If regulated carriers cannot. rely on the ICC's decisions, then the role of the ICC is severely restricted and the goals of the Interstate Commerce Act are frustrated. To protect the policy of the Interstate Commerce Act and the role of the ICC, some implied immunity must apply to this case.

The implementation of Plan B by the defendants extended over three years and four months. Proceedings on Plan B can be divided into four periods. From March 17, 1979 to January 16, 1980 Plan B was in effect during an ICC investigation. From January 16, 1980 to July 10, 1981, Plan B was in effect and had been approved by the ICC as lawful. From July 10, 1981 to July 20, 1982, the issue of the validity of the tariff was on remand from the Seventh Circuit. On July 20, 1982 the ICC ruled the tariff unlawful and ordered it cancelled within thirty days.

The policy that carriers should be able to put faith in ICC decisions does not apply with the same force to the time when Plan B was under investigation or the time after the Seventh Circuit reversed the ICC decision. However, as to the first block of time—between the filing and initial approval of the tariff by the ICC—a decision imposing liability would place carriers whose tariffs had been suspended during investigation in a better position as far as antitrust liability is concerned than those whose tariffs had been permitted to take effect. Moreover, the concern of the Court in *Keogh*, that recovery would require excessive speculation, is present here. Plaintiffs did have an adequate remedy before the ICC. Whether they pursued it or whether they were successful in attaining it does not mean that the remedy was not adequate.

As to the time period after reversal by the court of appeals, immunity is also warranted. The Seventh Circuit remanded the case to the ICC for further proceedings. The ICC might have found that the carriers had complied with the Agreement. To impose liability would require carriers to predict the outcome in the ICC. Moreover, the policies of avoiding speculation and an available alternative remedy are present.

We conclude that summary judgment in favor of the defendants should be granted on the ground of implied immunity. However, in the interests of economy at a later date, we shall decide the other issues before us.

### 5. Immunity under the Noerr-Pennington Doctrine

Plaintiffs argue that we should strike defendants' affirmative defense that their tariff filings are protected by the *Noerr-Pennington* doctrine. Under this doctrine, activity protected by the first amendment right to petition the government is protected from antitrust scrutiny. *See United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Tariff filings are immune from the antitrust laws "where their purpose is to influence governmental action." *MCI v. American Telephone & Telegraph Co.,* 708 F.2d at 1153. In *MCI,* the Seventh Circuit suggested that a tariff filing is not protected by *Noerr-Pennington* if it is a pro forma publication required by law and not an exercise of the right to *petition* the government. *Id.* at 1155 n. 113.

Under the Interstate Commerce Act, a rate bureau establishes tariffs, publishes them, and files them with the ICC. No ICC action is needed for a tariff to take effect. Though the Commission may reject a tariff on its own initiative or at the request of a third party, the filing of a tariff itself cannot be considered a "petition" to the government. *See Litton Systems,* 700

F.2d at 807–08. We agree with the Second Circuit's holding in *Litton* that "[t]he fact that the [agency] might set aside a tariff filing does not transform [defendant's] independent decisions as to how it will conduct its business into a 'request' for governmental action or an 'expression' of political opinion." *Id.* Though defendants filed the tariffs challenged here because the tariff previously in effect was stricken down, there is nothing to suggest that the context in which this tariff was filed was different from the ordinary tariff filing, in which the filing itself is not a request for governmental action. Plaintiffs' motion to strike defendant's *Noerr-Pennington* affirmative defense is granted.

### 6. *Per se Violation*

Plaintiffs argue that absent any exemption from antitrust liability, the defendants' conduct constituted price fixing and was, therefore, per se illegal under § 1 of the Sherman Act. The issue arises from the plaintiffs' motion in limine requesting defendants' conduct to be deemed a per se violation. Defendants assert that their conduct should not be deemed a per se violation of the antitrust laws. Because their conduct occurred in the context of a regulated industry, they argue, applying a per se rule is inappropriate. Plaintiffs argue that the fact of regulation is relevant only to the extent that the legislation expressly exempts defendants' conduct from liability. Because Congress created an express exemption, conduct falling outside that exemption should be considered as it would absent the regulation.

 Price fixing is indeed illegal, a principle which has been reaffirmed repeatedly by the Supreme Court in recent years. *See, e.g., Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). Initially, then, we must determine whether defendants' actions constitute price fixing. Defendants set the manner in which freight would be priced—either by a flat rate or a

proportional rate—according to whether the freight was transit or nontransit. Hence the agreement in question did not actually fix prices, but rather the manner in which those rates/prices are calculated. Nevertheless, the concept of price fixing which defines per se illegal conduct includes defendants' conduct. As the Supreme Court said in *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), "Any combination which tampers with price structures is engaged in an unlawful activity." *Id.* at 221, 60 S.Ct. at 843.

The Supreme Court has characterized conduct that related to the setting of prices, but was not literally price fixing, as price fixing and therefore illegal per se. For example, in *Catalano,* the Court held that an agreement among beer wholesalers to fix credit terms by refusing to extend credit to beer retailers constituted price fixing. The Court stated, "credit terms must be characterized as an inseparable part of the price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing." *Id.* 446 U.S. at 648, 100 S.Ct. at 1928. In *Catalano,* the Court discussed other instances in which conduct relating to price structures had been deemed per se illegal: an agreement to adhere to previously announced prices and terms of sale, an agreement to refuse to discuss prices with customers, and an agreement to use a specific method of quoting prices. *Id.* at 648, 100 S.Ct. at 1928.

The agreement among defendants to eliminate the transit privilege on proportional rate freight has a direct effect on the price of freight. Especially when the railroads are given such broad leeway to agree on rates without antitrust liability, an agreement on how rates are to be calculated effectively fixes prices. Defendants' activities constituted price fixing.

Next we must decide whether the regulatory context excuses the defendants from the per se rule. The plaintiffs argue that

footnote 30 in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) squarely addresses the issue of per se treatment of conduct that is not exempted by the Interstate Commerce Act. Footnote 30 states

"[Congress] can of course make *per se* rules inapplicable in some or all cases, and leave courts free to ramble through the wilds of economic theory in order to maintain a flexible approach." *United States v. Topco Associates, Inc.*, 405 U.S. [596] at 609, n. 10 [92 S.Ct. 1126 at 1134 n. 10, 31 L.Ed.2d 515], ... Indeed, it has exempted certain industries from the full reach of the Sherman Act. *See, e.g.*, ... 49 U.S.C. § 5b (Reed-Bullwinkle Act, rail and motor carrier rate-fixing bureaus).

102 S.Ct. at 2479. Although plaintiffs' assertion that the footnote answers the issue of per se illegality is an overstatement, footnote 30 suggests that the extent to which Congress made the per se rule inapplicable to rail and motor carriers is limited to rate-fixing bureaus acting within the Reed-Bullwinkle Act.

■ Pervasive regulation frequently *warrants application of the rule of reason* rather than a per se rule. However, when the regulatory scheme offers express immunity, the extent of protection from the antitrust laws is limited. Conduct which extends beyond that express exemption is not entitled to be sheltered from the antitrust laws. Per se illegal conduct remains per se illegal in the context of a regulatory scheme which creates an express exemption.

Defendants rely on *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) for the proposition that per se rules do not always apply to industries subject to regulation. In *Silver*, the Supreme Court refused to deem the defendant stock exchange's conduct illegal per se even though in an unregulated context, the per se rule would apply. The plaintiff in *Silver* was a broker who was not a member of the New York Stock Exchange. He sued because his wires to the Exchange were cut off without hearing or explanation by the Exchange. The Exchange's conduct was regulated by the Securities Exchange Commission under the Securities Exchange Act, an act which lacks an express exemption from antitrust liability. The plaintiff's allegation was based on an Exchange rule. The Court ruled that the conduct was not impliedly immune from antitrust liability, but that the defendant's conduct should be viewed under a rule of reason analysis. The Court reasoned that since the SEC lacked jurisdiction to review enforcement of the Exchange rule, no conflict existed between the antitrust laws and the securities laws. Repeal of the antitrust laws should be made "only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act." *Id.* at 361, 83 S.Ct. at 1259. A critical difference between this case and *Silver* is that in *Silver*, the regulatory legislation provided no antitrust immunity. It was necessary therefore for the Court to "[reconcile] the operation of both statutory schemes with one another rather than holding one completely ousted." *Id.* at 357, 83 S.Ct. at 1257. The rule of reason treatment provided the exchange with "breathing space within which to carry out the mandate of the Securities Exchange Act." *Id.* at 360, 83 S.Ct. at 1258. The defendants' breathing space in the instant case is the Reed-Bullwinkle Act. It is unnecessary for us to reconcile the Interstate Commerce Act with the antitrust laws, for Congress has already done so in providing express immunity.

In *United States v. McKesson and Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956) the Supreme Court was confronted by another express exemption from the antitrust laws, that in the Miller-Tydings Act. The action was brought by the United States against a drug manufacturer in setting retail prices with drug wholesalers. The defendant had notified wholesalers that "[n]one of our wholesale divisions will sell any McKesson-labeled products to any wholesaler who has not entered into a fair trade contract with McKesson Laboratories." The Miller-Tydings Act exempted from the antitrust laws

certain resale price maintenance agreements. The Supreme Court held that the conduct in question was not included in the antitrust exemption, for the Miller-Tydings Act specifically stated that it did not exempt agreements among wholesalers in competition with each other. Since the defendant acted as a wholesaler itself as well as a manufacturer, its conduct was not exempt. Before concluding that the conduct in question was subject to the antitrust laws, the court discussed the relevance of the exemption to the per se status of the conduct:

> The question before us is whether the price-fixing agreements challenged herein move along that route. If they do not, they are illegal *per se.* There is no basis for supposing that Congress, in enacting the Miller-Tydings and McGuire Acts, intended any change in the traditional *per se* doctrine. The District Court was plainly in error in attempting to create a new category of agreements which are outside the exemption of those Acts but which should nevertheless be spared from application of the *per se* rule.

*Id.* at 310–11, 76 S.Ct. at 940–41. Although *McKesson and Robbins* did not involve a regulatory context, the principle that the courts should not formulate a new treatment for conduct not expressly immune still applies.

Similarly, there is no evidence that Congress intended conduct outside of the Reed-Bullwinkle Act but within the railroad industry to be treated on a rule of reason basis. To the contrary, Congress intended that "the antitrust laws [should] apply with full force" except when the defendants act under an approved agreement. H.R. Report 1100, 80th Cong., 2d Sess. 4 (1948) *reprinted in* 1948 U.S.Code Cong. & Ad. News 1844, 1848.

■ When a regulatory statute creates express immunity, conduct which does not satisfy the provision creating immunity should be analyzed according to traditional antitrust principles. As the court said in *United States v. Baltimore & Ohio Railroad,* 538 F.Supp. 200 (D.D.C.1982),

The mandate of the Securities Exchange Act of 1934 differs fundamentally from the mandate of the Reed-Bullwinkle Act. The Exchange Act permitted the Stock Exchange to engage in a broad range of self-regulative actions, including establishment of barriers to membership, which were inherently anticompetitive ... The Reed-Bullwinkle Act, on the other hand, merely provides antitrust immunity for the discussion of, and agreement on, the setting of rates. The antitrust immunity extends, in other words, no further than the procedural agreement. Thus, no 'breathing space' is required here.

*Id.* at 210.

Finally, the conclusion that price fixing not expressly exempt is per se illegal comports with the ICC's view. In *Tidewater Coal Demurrage Agreement,* 356 I.C.C. 66 (1978), the ICC explained the considerations involved in approving an agreement among carriers under the Interstate Commerce Act. First the ICC determines whether the agreement enhances the goals of the national transportation policy. Then the ICC considers whether the agreement harms an interest intended to be protected by the antitrust laws. Finally, the ICC weighs these considerations to decide whether the benefits to the public through the national transportation policy outweigh the harm to interests protected by the antitrust laws. *Id.* at 75. About the second consideration, the ICC stated:

> [T]he second element, concerning whether an agreement will have anticompetitive effects, is presumed. This presumption arises from the holdings of the courts that the interests to be protected by the antitrust laws are always harmed by collective ratemaking agreements and that agreements such as these violate the antitrust laws per se without official exemption.

*Id.* Of course the ICC lacks jurisdiction to declare conduct violative of the antitrust laws per se, but the ICC's opinion that absent statutory exemption, conduct fixing rates is per se illegal is still persuasive.

Plaintiffs' motion in limine that defendants' conduct be deemed per se illegal since it is not exempt from the antitrust laws is granted.[16]

### 7. Collateral Estoppel on the Issue of Damages

The defendants have moved for a finding that the ICC determination that the plaintiffs have not suffered any injury collaterally estops plaintiffs to seek damages in this action. We have already ruled on the motions for collateral estoppel with respect to substantive issues decided by the ICC. *In re Wheat Rail Freight Rate Antitrust Litigation*, 579 F.Supp. 510 MDL No. 534 (N.D.Ill. Dec. 8, 1983) (Pretrial Order No. 26 granting in part and denying in part plaintiffs' motions with respect to collateral estoppel). There we held that defendants are collaterally estopped to challenge the ICC's decisions that the defendants had violated the Agreement, that the failure to adhere to the agreement procedures was not justified by exemptions specified in the agreement, and that therefore defendants violated § 10706(a)(2)(A). We also rejected the plaintiffs' argument that the ICC's findings alone mean that defendants had violated the Sherman Act. We are now confronted with whether the ICC's findings on the issue of damages are binding on the parties and this court.

Before the ICC, the plaintiffs who participated requested at least an accounting of profits earned by the defendants as a result of the illegal tariff. In dispute is whether the plaintiffs also sought compensation from the ICC proceeding.[17] On the issue of damages, the ICC concluded:

> In short, shippers have not demonstrated any equitable reason why in the circumstances of this case, reparations should be awarded on the basis proposed. Nor have they established actual injury flowing from the carriers' unlawful tariff publication. We, therefore, conclude that in these circumstances reparations are not appropriate absent a showing of injury.

*Transit on Wheat IV*, 365 I.C.C. at 900. The defendants argue that this finding by the ICC conclusively binds us on the question of whether the plaintiffs suffered any injury as a result of the defendants' unlawful tariff.

 Those petitioners who did not participate in the ICC proceeding are not collaterally estopped on the issue of damages. Although exceptions to the rule that collateral estoppel does not work against those who were not parties to the earlier proceeding exist, this is not such a case. Even if the nonparticipants had taken part before the ICC, they could have decided not to seek reparations and still proceeded in this case. *Carnation*, 383 U.S. at 224, 86 S.Ct. at 787.

 As to the plaintiffs who took part in the ICC proceeding, the question of collateral estoppel is more difficult. Collateral estoppel requires four elements: 1) identical issues; 2) a final judgment in the earlier proceeding; 3) that those to be estopped were parties to the earlier proceeding or were in privity with the parties; and 4) a full and fair opportunity to litigate the issue in the earlier proceeding. *Oldham v. Pritchett*, 599 F.2d 274 (8th Cir.1979). The second and third element are present here. *Transit on Wheat IV* was not appealed. It is a final judgment. Also, we are now concerned with those who were actually parties to the ICC proceeding, so the third condition is satisfied. The first and fourth prerequisites are not as clear.

Damages under the antitrust laws and reparations under the Interstate Commerce Act compensate for distinct injuries and

---

**16.** Defendants Illinois Central Gulf Railroad Co. and Elgin, Joliet & Eastern Railway Co. have argued further that they should not be held liable under a per se rule because they did not participate in promulgating Plan B. As we have discussed in two earlier opinions, Pretrial Orders 20 and 26, further illumination is necessary before we can tell exactly what role if any defendants had in alleged conduct. Hence, ruling on the asserted defense would be premature at this point.

**17.** See Section 2 *supra.*

promote distinct policies. Although in a given case, the measure of injury under the Interstate Commerce Act may be equivalent to the measure of damages under the antitrust laws before tripled, the two are truly different remedies.

■ In fact the ICC lacks authority to decide the antitrust issues. As the Supreme Court said in *McLean Trucking Co. v. United States*, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944),

> Congress has vested expert administrative bodies such as the Interstate Commerce Commission with broad discretion and has charged them with the duty to execute stated and specific statutory policies. That delegation does not necessarily include either the duty or the authority to execute numerous other laws. Thus, here, the Commission has no power to enforce the Sherman Act as such.

*Id.* at 79, 64 S.Ct. at 376. The ICC's lack of authority to define antitrust injury suggests that its decision on injury under the Interstate Commerce Act must not be definitive on the issue of antitrust injury. As the defendants stated in their Brief for Baltimore & Ohio Railroad Co., et al. On Petition for Review of an Order of the Interstate Commerce Commission,

> [A]ntitrust cases must be tried in the federal courts system. "Violations of the antitrust acts are cognizable only in the courts." *Excelsior From St. Paul, Minn.*, 36 I.C.C. 349, 362 (1915). The converse theorum would be that antitrust issues cannot be adjudged by the Commission. Thus, in *Copps v. Alabama G.S.R. Co.*, 319 I.C.C. 92 (1963), in response to contentions as to a conspiracy to eliminate competition, the Commission repeated that it had "no jurisdiction over shipper claims based on antitrust violation."

Brief for Baltimore & Ohio Railroad at 19.

■ In the case at bar, what the ICC did decide was that some of the present plaintiffs had not suffered an injury cognizable by the Interstate Commerce Act. The ICC could decide no more. Hence, we are confronted with a new issue and cannot apply the rule of collateral estoppel.

Application of collateral estoppel also requires that the party have had a full and fair opportunity to litigate the issue in the earlier proceeding. Even assuming that the issue before the ICC is the same as that before us, it is not clear that the petitioners had a full opportunity. As we discussed in section 2 of this opinion, whether the petitioners even sought reparations before the ICC is subject to dispute. If the petitioners did not seek reparations, they of course are not barred from seeking damages here. *Carnation*, 383 U.S. at 224, 86 S.Ct. at 787.

The issue decided by the ICC was not the same as the issue we would decide. Further, it is unclear whether plaintiffs had a full and fair opportunity to litigate the issue of damages. Thus, summary judgment on the ground of collateral estoppel would be inappropriate and defendants' motions in that regard are denied.

■ The only remaining issue is class certification. Defendants urge us to defer ruling on the class issue. Plaintiffs argue that we should rule on the class issue at the same time as we decide the motions on the merits. We recognize the jurisprudence indicating that Fed.R.Civ.P. 23(c)(1) contemplates ruling on the class issue before ruling on the merits. The volume of motions in this case, however, has caused us to decide the motions in the order that was most efficient. To certify a class at this point would be unfair to the absent members of the potential class. Only plaintiffs have asserted that we should decide the class issue. Certification of a class would prejudice only the plaintiffs. Defendants, who would benefit from certification of a class, have requested us to defer ruling. Hence, they cannot complain that we did not certify a class. The best result then is to decline to rule on the question at this time. If the ruling on the merits of the complaint is reversed, we will decide the class certification issue as soon as the case is remanded.

543

At the next pre-trial conference scheduled for February 14, 1984, at 2:00 p.m., we will inquire of the defendants as to the future of their counterclaims and in light of their responses whether a finding pursuant to Fed.R.Civ.P. 54(b) should be entered regarding the grant of summary judgment to the defendants on the theory of implied immunity and whether other rulings by the court should be certified pursuant to 28 U.S.C. § 1292(b) (1976).