PRUNE BARGAINING ASSOCIATION, a non-profit Cooperative Association, J. Massoni and Edward Massoni, as co-partners doing business as J. & E. Massoni, Ben W. McCutchan and W. O. McCutchan, Jr., as co-partners doing business as McCutchan Ranches, J. A. Breeding, John A. Breeding, Jr., and Lester B. Breeding, as co-partners doing business as J. A. Breeding & Sons, Louis Matteucci and James Matteucci, as co-partners doing business as Matteucci Bros., Donald Fredson and Leonard Fredson, as co-partners, Frank Bozzo, Sam Bozzo and Emil Rossi, co-partners doing business as Frank Bozzo & Son, James Brocker and John Brocker, co-partners doing business as Brocker Bros., Ronald G. Waltenspeil and Rebecca Waltenspeil, co-partners doing business as Timber Crest Farms, W. L. Stile and W. L. Stile, Jr., co-partners doing business as W. L. Stile & Son, John J. Mezzanotte, Walter W. Kolthoff, George T. Kersh, Manuel George, Hereward G. Petersen, C. Hollis Black, Erwin C. Derrick, Henry S. Bisordi, George Bisordi, David C. Williams, Ray Pigoni, Carmen E. Filice, Peter L. Nissen, Erwin C. Derrick, Walter H. Nock, Ray M. Stanton, Robert A. Huffman, Silas Griffin, W. F. Wentz, Charles Anthony, Donald L. Eberly, Jack F. Douglas, A. J. Melani, Harold M. Ross, Leon Eller, Mitchell Soso, John A. Breeding, Jr., Sheridan Ballard, A. D. Saso, Manuel Souza, A. S. Hambly, Louie A. Lasich, Edward Massoni, Mildred Sanders, John Castello, Harold J. Cerrato, Francis N. Schwab, Raymond Brocker, Joseph A. Zanger, Charles D. Filice, Vincent Castello, Louis A. Scaglione Jr., Jack Baird, Ralph M. Santos, Ralph Santos Jr., Mary V. Reilly, Ewald Strom, Harold A. Hoskins, Mrs. Lillian B. Pilate, Gordon Holvick, Piara Singh Gosal, Gurman Singh Parma, Nirmal Singh, Mrs. Ida Rose, James H. Peterson, Bruno O. Buti, Bernard A. Lile, Barry Gold, Howard D. Harper, Angela A. Harper, Martin Rajkovich, Joseph Filice, Louis Lepara,

Mike Cari, James S. Johnston and Claudine Johnston, copartners dba Ramona Ranch, John Saunders & Sons, Inc., Plaintiffs,

v.

Earl BUTZ, Secretary of Agriculture of the United States, Sunsweet Growers, Inc., a nonprofit Cooperative Association, Del Monte Corporation, Harter Packing Company, Paul A. Mariani Company, Mayfair Packing Company, Valley View Packing Co., Inc., Stapleton-Spence Packing Co., Battaglia Packing Co., First Doe through Fifteenth Doe, Defendants.

No. C–74–1976 WHO.

United States District Court,
N. D. California.

May 21, 1975.

James L. Browning, Jr., U.S. Atty., William T. McGivern, Jr., Asst. U.S. Atty., San Francisco, Cal., for Earl Butz.

A. James Roberts, III, Tuttle & Taylor, Los Angeles, Cal., for Sunsweet Growers.

Robert M. Westberg, Reginald D. Steer, Pillsbury, Madison & Sutro, San Francisco, Cal., for Del Monte.

Mezzetti & Testa, Hoge, Fenton, Jones & Appel, San Jose, Cal., for Harter Packing, Paul A. Mariani Co., Mayfair Packing, Valley View Packing, Stapleton-Spence Packing.

## MEMORANDUM OPINION

ORRICK, District Judge.

Plaintiffs, Prune Bargaining Association—an organization representing 217 of the approximately 2,500 producers of California prunes—and numerous individual prune growers, seek to permanently enjoin defendants Earl Butz, the Secretary of Agriculture of the United States, and several prune handlers from enforcing certain pro-

visions of regulations promulgated by the Secretary under the authority delegated him by the Agricultural Marketing Agreement Act of 1937 ("the Act") (7 U.S.C. § 601 *et seq.*). This Court denied plaintiffs' motion for a preliminary injunction after a full hearing on October 24, 1974, on the grounds that the sought-after relief would severely disturb the *status quo* and that plaintiffs were unlikely to succeed on the merits. *King v. Saddleback Junior College District*, 425 F.2d 426 (9th Cir. 1970); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir. 1963), *cert. denied*, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963). A second hearing was held on November 22, 1974, at which time the parties argued the merits of plaintiffs' motion for a permanent injunction and cross motions for summary judgment. The Court having received oral argument and having duly considered the affidavits and memoranda filed in support of and in opposition to the motions, and being fully advised in the premises, denies plaintiffs' motions and grants defendants' motion for summary judgment.

## I. *Background.*

In creating the complicated scheme of administrative regulation that eventually became the Act, the declared policy of Congress was to establish and maintain orderly marketing conditions for agricultural commodities in interstate commerce and to establish and maintain parity prices for such commodities. 7 U.S.C. § 602.[1] Accordingly, the Act delegates to the Secretary broad regulatory power over handlers of specified agricultural products. The Secretary is authorized to issue (after notice and hearing) marketing orders which regulate the activities of handlers of controlled commodities. § 608c(1), (3) and (4). Marketing orders must contain one or more of the terms and conditions set forth in Section 608c(6),[2] and after approval by producers at a referendum (§ 608c(8), (9), (12) and (19)), a marketing order is published in the Code of Federal Regulations and carries the force of law. Marketing Order Number 993 ("the Order"), issued in accordance with the formal requirements of the Act, regulates the handling of "Dried Prunes Produced in California". 7 C.F.R. Part 993. The Order is only one of the 47 marketing orders dealing with the production and marketing of fruits and vegetables promulgated under the Act, although it is one of the more complex.

Pursuant to provisions of the Order, the Secretary delegated the responsibility of implementing the policy reflected in the Act and Order to a body known as the Prune Administrative Committee ("the Committee"). The Committee is composed of 21 members of the California Prune industry, 14 of whom are selected from among prune producers. The remaining 7 are selected from among prune handlers. 7 C.F.R. § 993.24 (1974).

In order to administer the Act and Order, the Committee is authorized to issue regulations—subject to the approval of the Secretary. Actions of the Committee must be recommended by majority vote of the members present and voting, but decisions relating to marketing policy, salable and reserve percentages, and any matters germane to the control or disposition of reserve prunes require at least 14 affirmative votes. 7

---

1. Hereinafter, unless otherwise indicated, all statutory references are to sections of Title 7 of the United States Code.

2. Marketing orders may provide for limitation of production, allotment of commodities (or of any particular size or grade of a commodity), inspection of commodities, and for various other controls on production and marketing. Particularly relevant to the instant case are subsections D and E, which authorize the Secretary to insert provisions:

    "(D) Determining, or providing methods for determining, the existence and extent of the surplus of any such commodity or product, or of any grade, size, or quality thereof, and providing for the control and disposition of such surplus, and for equalizing the burden of such surplus elimination or control among the producers and handlers thereof.

    (E) Establishing or providing for the establishment of reserve pools of any such commodity or product, or of any grade, size, or quality thereof, and providing for the equitable distribution of the net return derived from the sale thereof among the persons beneficially interested therein."

C.F.R. §§ 993.36(n), 993.33, 993.35 and 993.-83.

The Act authorizes the Secretary to establish a reserve pool of the regulated commodity (§ 608c(6)(E)) in order to combat overproduction and the economic ailments that accompany it. The first prune marketing order, issued in 1949 (14 Fed.Reg. 4684), did not contain a reserve pool provision. In 1965, however, it was amended to include such a procedure. 30 Fed.Reg. 8850. The 1965 amendment was promulgated subsequent to a full rule-making proceeding and became effective after a referendum of producers.

The maintenance of the reserve pool is discussed in detail in the Order. 7 C.F.R. §§ 993.54, 993.59 and 993.65. The rules are quite detailed, and relate to such diverse aspects of procedure as the pricing of reserve prunes, the care of such prunes and allocation of the cost of maintaining the reserve pool. The crucial provision for purposes of the instant case is 7 C.F.R. § 993.-65, which deals with the disposition of reserve prunes.[3]

Pursuant to the authority granted by Section 993.65(a), the Committee has entered into several yearly sales agreements with prune handlers since 1965. Such marketing agreements are regulated and defined by provisions enacted by the Committee and approved by the Secretary. See, e.g., 7 C.F.R. § 993.156.

The reserve pooling procedure is complex. A good deal of the complexity stems from the nature of the commodity itself because prunes are marketed in as many as 18 size categories. The categories are expressed in terms of numbers of prunes per pound and, generally, large size prunes command a greater market value than smaller prunes. Under the terms of the Order, each handler must set aside as reserve prunes a given percentage of prunes of each size he receives from each producer. These reserve

3. 7 C.F.R. § 993.65 provides:

"(a) *Committee's right of disposition.* The committee shall have the power and authority to sell or dispose of any and all reserve prunes (1) to meet demand either (i) as domestic trade demand, or (ii) as foreign trade demand, or (2) for use in any outlet, defined in rules and procedures, established by the Secretary after recommendation of the committee, noncompetitive with normal outlets for salable prunes.

(b) *Methods of disposition.* The committee may, for any of the purposes of § 993.65(a), offer to sell and sell reserve prunes to handlers for disposition or sale by them in specified outlets. Sale of reserve prunes by the committee to any handler for resale in such outlets or for resale to other persons for sale in such outlets shall be governed by the provisions of a sales agreement, executed by the handler with the committee. The committee may refuse to sell reserve prunes to any handler if the handler violates the terms and conditions of the agreement or other provisions of this part. The committee may sell reserve prunes into any outlet in which direct selling is determined to be more appropriate.

(c) *Offers to sell reserve prunes.* No offer to sell reserve prunes either to handlers or to other persons shall be made by the committee until 5 days (exclusive of Saturdays, Sundays, and holidays) have elapsed from the time it files with the Secretary complete information as to the terms and conditions of the proposed offer including the basis for determining the handlers' shares: *Provided,* That at any time prior to the expiration of the 5–day period the offer may be made upon the committee receiving from the Secretary notice that he does not disapprove it.

(d) *Transfer of shares.* No handler may transfer a reserve obligation. However, any handler who is authorized by the committee to dispose of reserve prunes may arrange with another handler to dispose of his share of reserve prunes through such other handler. In that event, credit for the reserve disposition shall go to the handler whose reserve prunes are used.

(e) *Distribution of proceeds.* Expenses incurred by the committee for the receiving, handling, holding, or disposing of any quantity of reserve prunes shall be charged against the proceeds of sales of such prunes. Net proceeds from the disposition of reserve prunes shall be distributed by the committee either directly, or through handlers as agents of the committee, under safeguards to be established by the committee, to persons in proportion to their contributions thereto, or to their successors in interest, with appropriate grade and size differentials as established by the committee. Progress payments may be made by the committee as sufficient funds accumulate. Distribution of the proceeds in connection with the reserve prunes contributed by a cooperative marketing association shall be made to such association, if it so requests."

prunes are not physically segregated from the salable prunes, however, and thus the reserve is, in fact, a paper reserve. Since California prunes are harvested in August and September for the most part, supplying buyers with prunes of the various sizes they desire is a relatively easy matter in the fall when handlers' stocks are plentiful in all grades. As the crop year progresses, however, prunes in some of the categories of salable tonnage tend to become scarce. So, to continue to fill all orders, handlers exchange reserve prunes of one size for reserve prunes of the size for which they may have an order that exceeds their supply of salable prunes. Since the reserve is only a paper reserve to begin with, the actual taking of reserve prunes from the desired size category is a simple matter. The reserve-salable percentage of another category is then altered—again on paper only—in order to return the handler's stock to the designated overall reserve-salable balance.

## II. *Contentions of the Parties.*

Plaintiffs do not challenge the constitutionality of the Act. Nor do they argue that the Marketing Order in its present form is not authorized by the Act. Rather, plaintiffs contend that: (1) the exchange of reserve and salable prunes as described above is not authorized by either the Act or the Order; and (2) the current method of pricing reserve prunes in general and exchanged reserve prunes in particular violates due process. Defendants controvert those allegations and, in addition, argue that plaintiffs have failed to exhaust the administrative remedy.

## III. *Jurisdiction.*

The question of whether this Court has jurisdiction to hear this case is two-pronged. First, does the Act authorize federal district courts to hear producer complaints about the administration of the Act by the Secretary or his delegates? Second, even assuming that the Court is empowered to hear such a complaint, must the producer-plaintiff exhaust a specific administrative remedy prior to filing his complaint?

### A. *Subject Matter Jurisdiction.*

■ "The several district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating any order, regulation, or agreement, heretofore or hereafter made or issued pursuant to this chapter, in any proceeding * * * hereafter brought in said courts." § 608a(6). This provision has historically been invoked to obtain subject matter jurisdiction in federal district courts in suits brought by the Secretary to enforce the Act (see, e.g., *American Fruit Growers v. United States,* 105 F.2d 722 (9th Cir. 1939); *Whittenburg v. United States,* 100 F.2d 520 (5th Cir. 1938)), although at least one court found subject matter jurisdiction under Section 608a(6) in a suit brought by individuals desiring to be deemed handlers or producers within the meaning of the Act. *Roloff v. Perdue,* 31 F.Supp. 739 (N.D.Iowa 1939). Whether Section 608a(6) is limited to only those enforcement actions brought by the Secretary is not a question that need be reached here, however, because jurisdiction arises pursuant to 28 U.S.C. § 1331(a), the general jurisdiction provision for matters arising under the laws of the United States. *Stark v. Wickard,* 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *Consolidated-Tomoka Land Company v. Butz,* 498 F.2d 1208, 1210 (5th Cir. 1974); *Chiglades Farm, Ltd. v. Butz,* 485 F.2d 1125 (5th Cir. 1973), *cert. denied sub nom., Bramson v. Butz,* 417 U.S. 968, 94 S.Ct. 3170, 41 L.Ed.2d 1138 (1974).

### B. *Exhaustion of Administrative Remedies.*

■ Any handler dissatisfied with any order or any provision of an order promulgated by the Secretary may file a written petition with the Secretary. Upon such a filing, the Secretary is obligated to provide a hearing on the petition (pursuant to regulations adopted by the Secretary) and to eventually make a final ruling on the complaint raised in the petition. § 608c(15)(A). If the handler seeks further relief, he may

petition the United States District Court for the district in which he inhabits. § 608c(15)(B). The jurisdiction granted the court is limited to an inquiry as to whether the Secretary's ruling is in accordance with law. The court is confined to reviewing the record of the Section 608c(15)(A) proceeding; the court can overturn the administrative determination only if it finds the Secretary's decision arbitrary, capricious or not supported by substantial evidence. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Lewes Dairy, Inc. v. Freeman,* 401 F.2d 308, 315–316 (3d Cir. 1968), *cert. denied sub nom., Lewes Dairy, Inc. v. Hardin,* 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969); *Chiglades Farm, Ltd., v. Butz, supra.* This statutorily defined manner of challenging the Secretary's marketing orders and other regulations is expressly limited to handlers, however, and no stretching of the rules of statutory construction will permit the inclusion of producers within the procedure enumerated in Section 608c(15).

The Secretary contends that plaintiffs have not exhausted administrative remedies because they have failed to invoke the statutory rule-making proceedings authorized in Section 608c(3) and (4).[4] Subsections 3 and 4 require the Secretary to hold a hearing on any proposed order he has reason to believe would tend to effectuate the policy of the Act. After a proper hearing, the Secretary may issue such an order if he believes, upon the evidence adduced, that the proposed order will effectuate the legislative policy. Pursuant to the mandate of the statute, the Secretary has established administrative procedures under which amendments to marketing orders may be proposed and prosecuted. 7 C.F.R. § 993.93; 7 C.F.R. §§ 900.1–900.18.

Plaintiffs do not seek to amend the Order or to propose a new one; rather, they contend that defendants' interpretation of that Order and the regulations promulgated thereunder is contrary to the language and intent of the statute and that the pricing provisions of the Order and of the regulations are unconstitutional. Defendants have cited no cases in support of their proposition that in the absence of a statutory provision establishing an administrative review of challenges to the legality of an administrative regulation (as § 608c(15) does) an aggrieved party must initiate the essentially legislative process of amending the unlawfulness out of an existing regulation in order to exhaust his proverbial administrative remedies. *Schuck v. Butz,* 163 U.S.App.D.C. 142, 500 F.2d 810 (1974), cited by the Secretary, is inapposite. There, the relief sought was the repeal of an existing regulation and the substitution of a totally contrary one. *Id.* at 811. The current regulation or the government's interpretation of it was not challenged as unlawful. *Wheelabrator Corporation v. Chafee,* 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971), and the doctrine of primary jurisdiction lend no aid to defendants' assertion that a party must seek to change a rule before attacking it as unlawful, and *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970), is similarly irrelevant.

■ In *Stark v. Wickard, supra,* the Supreme Court was presented with a challenge by milk producers to regulations promulgated by the Secretary pursuant to the Act. In holding that producers were not precluded from judicial examination of the challenged regulations despite the lack of a

---

4. Subsections (3) and (4) provide:

"(3) Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this chapter with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order.

(4) After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this chapter with respect to such commodity."

producer concomitant to Section 608c(15), the Court imposed no Section 608c(3) and (4) exhaustion requirement upon them. Producers have also been permitted to challenge the Secretary's regulations in other cases. *Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *Blair v. Freeman*, 125 U.S.App.D.C. 207, 370 F.2d 229 (1966); *Consolidated-Tomoka Land Company v. Butz, supra.* The courts in *Zuber, Blair* and *Consolidated-Tomoka* did not allude to an exhaustion requirement similar to the one proposed by the Secretary here. In the absence of an express legislative directive and any binding precedent, I conclude that producer-plaintiffs are not compelled to seek a "promulgation hearing" (*United States v. Mills*, 315 F.2d 828, 833 (4th Cir. 1963)) pursuant to subsections (3) and (4) of Section 608c in order to exhaust administrative remedies, and, accordingly, find that the Court has jurisdiction to entertain this suit.

### IV. *The Exchange Privilege.*

The primary question before the Court is whether the exchange by handlers of salable prunes for reserve prunes is authorized by the Act. This so-called exchange privilege is the end product of a confusing combination of administrative regulations and statutory and contractual provisions. It is thus necessary to peel away the layers of statute, regulation and contract a layer at a time, and to scrutinize whether each layer is authorized by the previous one and by the ones preceding its immediate source of authorization. After that inquiry is completed, it is incumbent on the Court to stand back and determine whether the challenged aspect of the regulatory scheme—the exchange privilege—furthers the objective Congress sought to accomplish in enacting the overall plan.

If peeling away the layers of authorization in this regulatory scheme were like peeling away the layers of an onion, the top layer would be the first to go. Unfortunately, this task cannot be accomplished with such ease, for unlike the independent layers of an onion, the various layers here are highly interdependent and do not neatly separate from one another. In fact, only one layer is subject to just one interpretation. That layer, quite logically, is the final one—the contract between the Committee and the handlers. The current version of that document (which is denominated the Prune Reserve Tonnage Sales Agreement ("the Agreement")) provides in paragraph 5:

> "The Handler, after execution of this Sales Agreement, may exchange salable prunes for an equal quantity of reserve prunes held by him. The existence of any such exchange will be determined only where there is delivery of surplus. In such an event, delivery shall be made by the Handler within 30 days of demand, or such other period as the Committee may set, and the Committee shall not defer its demand for delivery beyond the October following the date of determination made pursuant to paragraph 7. To the extent that there has been an exchange permitted hereunder and the total value of the prunes delivered pursuant to paragraph 7, as such value is determined pursuant to paragraph 6, is less than the residual value of the Handler's reserve obligation, determined by subtracting from the paragraph 1 total value any of his released tonnage multiplied by the Handler's average paragraph 1 value per ton for such tonnage, the Handler shall pay to the Committee the difference between such delivered value and the residual value."

This provision unquestionably authorizes the exchange privilege as it is currently practiced. The question is whether the Committee and the handlers may enter into such an agreement consonant with the Act, the Order and the regulations.

Before embarking on the chore of scrutinizing whether one regulation or statutory provision authorizes the next, a basic principle must be remembered. In reviewing another provision of the Act, the Supreme Court noted that it accords significant weight to an agency's construction of its own enabling legislation, particularly when the administrators participated in the stat-

ute's drafting and directly made known their views to Congress in committee hearings. And while such a consideration is "only one input in the interpretational equation, * * * absent any indication that Congress differed with the responsible department, a court should resolve any ambiguity in favor of the administrative construction, if such construction enhances the general purposes and policies underlying the legislation". *Zuber v. Allen, supra,* 396 U.S. at 192, 90 S.Ct. at 327.

Congress expressly delegated to the Secretary the authority to promulgate a marketing order containing provisions directed to controlling overproduction of a given commodity by the establishment of a reserve pool. § 608c(6)(D) (see footnote 2, *supra*). The Act also empowers the Secretary to provide for the disposition of the products placed in such a reserve. § 608c(6)(E) (see footnote 2, *supra*). Accordingly, the Secretary included such provisions in the 1965 amendments to the original marketing order. The amendments became effective after ratification by producers, and are now found in 7 C.F.R. § 993.65 (see footnote 3, *supra*).

The Secretary has interpreted the Order, his own regulation, as permitting the sale of reserve prunes "in an orderly manner so as to maximize total sales of prunes and returns to producers". 30 Fed.Reg. 6788 (1965). This orderly manner was seen by the Secretary and the Committee as permitting handlers to exchange salable prunes for reserve prunes, but only pursuant to a sales agreement as authorized by other regulations. 7 C.F.R. § 993.157(f).[5]

This returns us to the Agreement, paragraph 5 of which was quoted above, and which unquestionably authorizes handlers to exchange prunes within the reserve pool.

■ The Secretary, then, in attempting to achieve the objective of the Act—the maintenance and establishment of orderly marketing procedures and of parity prices—

has indicated through his Order and the regulations promulgated thereunder that if the producers through the Committee enter into a contract with handlers permitting the handlers to exchange reserve for salable prunes, and if such contract provides for specified compensation for the value lost to producers on account of such exchanges, then the congressional goals will have been met. Contrary to plaintiffs' assertion, the exchange privilege is within the spirit as well as the letter of the Act. Prices for prunes that remain in the reserve (after their exchange for more desirable prunes) are of necessity lower than prices for the exchanged prunes; it is this artificial control over supply and demand that is the backbone of the Act.

Accordingly, applying the standard quoted from *Zuber v. Allen, supra,* and reviewing the entire record, I find that not only is the exchange privilege authorized by the Act and the Order, but that it tends to effectuate the policy codified in the statutory scheme. It may be true, as plaintiffs contend, that such policy *could* be realized in a manner which does not include an exchange privilege, but determining policy issues is not the function of this Court.

## V. *Pricing.*

Although reserve prunes may be sold throughout the crop year, producers do not receive payment for them until the reserve is liquidated at the end of the year. Pursuant to the Agreement, the price is set by the Committee at that time. It is this pricing by the Committee that upsets plaintiffs, primarily because the Committee sets one price, which price governs. The Secretary relies on the time-honored authority of the executive branch in the exercise of its powers under the Commerce Clause, to regulate prices when Congress so mandates. Plaintiffs, however, seek to draw a distinction between the setting of minimum prices and the setting of the only price. This,

5. 7 C.F.R. § 993.157(f) provides:

"No handler shall exchange salable prunes for reserve prunes unless he has entered into a sales agreement authorized pursuant to

§ 993.65(b) whereby the value of any such exchange, and payment therefor to the committee, shall be determined."

however, is a distinction without a difference.

This contention does not merit an extended discussion, for the power of the government to regulate all phases of the marketing of commodities in or affecting interstate commerce has been established for decades. *United States v. Rock Royal Co-operative, Inc.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); *Wallace v. Hudson-Duncan & Co.,* 98 F.2d 985 (9th Cir. 1938). The precedents emphasize that the Act was devised as a means for combating chronic fluctuation of prices due to overproduction of certain commodities, and that the Act delegates to the Secretary, through the Commerce Clause, the utmost of flexibility in achieving the legislative goals. This authorization has been interpreted to be as broad as that reserved by the states to regulate intrastate commerce (*United States v. Rock Royal Co-operative, Inc., supra,* 307 U.S. at 569–570, 59 S.Ct. 993; *Wallace v. Hudson-Duncan & Co., supra,* 98 F.2d at 993) and the fixing of prices by state agencies has been upheld in the face of a due process challenge. *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

In an ancillary contention, plaintiffs argue that the price fixing constitutes a taking without just compensation. The allegation fails on both its premises. The price fixing is not a taking (see *Wallace v. Hudson-Duncan & Co., supra,* 98 F.2d at 989–990) and producers do receive just, although perhaps not ideal, compensation under the present system. Plaintiffs ignore the fact that the price is set by the Committee—the body elected to represent the interest of producers as well as of the industry in general—and only then in light of the field price producers received for their salable prunes during the crop year.

## VI. *Conclusion.*

Plaintiffs are dissatisfied with prune marketing under the Act, with the Secretary's interpretation of his regulations, and with the Committee's conduct in general. And while plaintiffs have standing to assert their specific claims in federal district court, I find them to be without merit. Plaintiffs may take their case to the Secretary for a reevaluation of the Order and the regulations, for although the Order and the regulations are lawful, plaintiffs and other producers may prevail upon the Secretary to change them in order to better achieve the purpose behind the Act.

The above shall constitute the Court's Findings of Fact and Conclusions of Law. Accordingly, plaintiffs' motions for a permanent injunction and for summary judgment are denied, defendants' motion for summary judgment is granted, and the case is dismissed.