**Louis G. BERNING, Plaintiff,**

v.

**Fred GOODING, Ray Obendorf, Peter Rooney, George Signoratti, Herman Goschie, Robert Coleman, Bill Gasseling, Harlan Shinn, Melvin Newhouse, Ken Desserault, Alcid Roy, Mike Koreski, Rip Riel and Robert H. Eaton, Defendants.**

**Civ. No. 84–895–PA.**

United States District Court,
D. Oregon.

June 18, 1985.

On Motion To Dismiss Second Amended Complaint Jan. 7, 1986.

Clifford N. Carlsen, Jr., John F. Neupert, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for plaintiff.

Charles J. Merten, Merten & Fink, Portland, Or., for defendant Fred Gooding.

Paul T. Fortino, Calvin L. Keith, Portland, Or., for defendants Ray Obendorf, Peter Rooney, George Signoratti, Herman Goschie, Robert Coleman, Bill Gasseling, Harlan Shinn, Melvin Newhouse, Ken Desserault, Alcid Roy, Mike Koreski, Rip Reil, and Robert H. Eaton.

PANNER, Chief Judge.

In this action plaintiff Louis Berning alleges that he was damaged by defendants' violations of the antitrust laws and by defendants' tortious interference with prospective advantage. Plaintiff was a hop grower. All but one of the defendants are hop growers who were or are members of

the Hop Administrative Committee (HAC). Defendant Robert Eaton, while not a grower, was HAC's manager during the relevant time, and still is.

Defendants move to dismiss, alleging that plaintiff fails to state a claim under either the antitrust laws or for tortious interference. I grant the motion with respect to both claims. The dismissal is without prejudice and plaintiff has leave to replead. Defendants Newhouse and Obendorf also move to dismiss for insufficiency of process. I deny their motion as moot.

## BACKGROUND

HAC was created pursuant to the Agricultural Marketing Agreement Act of 1937 (the Act), 7 U.S.C. § 601 *et seq.* The Act empowers the Secretary of Agriculture to "establish and maintain ... orderly marketing conditions for agricultural commodities" so that farmers would receive "parity prices" for the commodities. 7 U.S.C. § 602(1). The Act allows the Secretary to issue marketing orders for certain commodities, including hops. 7 U.S.C. §§ 608c(1), (2). Hop orders may contain terms "limiting ... the total quantity ... during any specified period or periods" and "apportioning ... the total quantity of hops of the then current calendar year ... equitably among all producers." 7 U.S.C. § 608c(6)(G).

In 1966, at the request of hop growers, the Secretary issued the Hops Marketing Order (1966 Order), found at 7 C.F.R. § 991. Growers approved the 1966 Order by referendum. The 1966 Order provides for the creation of HAC. Members are growers appointed by the Secretary, and are subject to removal by the Secretary at any time. 7 C.F.R. §§ 991.17, 991.37.

HAC's duties include adopting a hops marketing policy and making recommendations to the Secretary for the "saleable quantity" and "allotment percentage" of hops. 7 C.F.R. § 991.36. The policy and recommendations pertain to the "ensuing marketing year," defined as from August 1 to July 31 of the next crop year. 7 C.F.R. §§ 991.10, 991.36. In making the recommendations, HAC should consider several factors affecting marketing conditions. 7 C.F.R. § 991.36.

On the basis of HAC's recommendation or other information, the Secretary may decide to limit the saleable quantity for that marketing year if this would effectuate the purposes of the Act. 7 C.F.R. § 991.37. The Secretary is not bound by HAC's recommendations.

*Rights of the Secretary.*

. . . . .

Each and every decision, determination, and other act of the committee shall be subject to the continuing right of disapproval by the Secretary at any time. Upon such disapproval, the disapproved action of the Committee shall be deemed null and void, except as to acts done in reliance thereon or in accordance thereof prior to such disapproval by the Secretary.

7 C.F.R. § 991.71.

In his complaint, plaintiff alleges the following. At HAC's 1980 meeting, defendants conspired to recommend "saleable percentages" for the 1981 to 1987 years. The percentages were to vary from 100% to 130%, with most years set at 130%. (Complaint, ¶ 11.) Presumably the Secretary adopted the percentages for the 1981 to 1984 crop years, as plaintiff alleges that the Secretary routinely approves the recommendations without conducting an independent analysis. (Complaint, ¶ 7.)

Plaintiff further alleges that the saleable percentages were made without regard to factors affecting marketing conditions, that there was no notice or opportunity for hearing regarding the recommendations, and that the recommendations were made in a way that allowed the "filling of deficiencies through illegal means." (Complaint, ¶ 13.) Plaintiff says that these tactics allowed defendants to "usurp the market for hops to themselves," leaving plaintiff unable to profitably grow or market hops. (Complaint, ¶ 14.)

Defendants have moved to dismiss both claims for failure to state a claim, pursuant

to Fed.R.Civ.P. 12(b)(6). Defendants base their motion on several grounds, the most important of which is that defendants are expressly or impliedly immune from liability for their acts as HAC members. I grant the motion to dismiss the first claim on this ground. I also grant the motion to dismiss the second claim because of express regulatory immunity, and because it is a pendent claim for which no other ground of jurisdiction is stated. The dismissal is without prejudice and plaintiff has twenty days leave to file an amended complaint.

## STANDARDS

When a federal court rules on a motion to dismiss for failure to state a claim, the court must review the sufficiency of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The court should construe the allegations in the complaint most favorably to the pleader.

> In evaluating the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted).

## DISCUSSION

Defendants are expressly immune from antitrust liability for the conduct alleged in the complaint. Section 608b of the Act provides:

> In order to effectuate the declared policy of this chapter, the Secretary of Agriculture shall have the power, after due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, only with respect to such handling as is in the current of interstate or foreign commerce or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof. The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful: *Provided,* That no such agreement shall remain in force after the termination of this chapter.

7 U.S.C. § 608b.

The statute applies here. Plaintiff does not attack the statute's validity. Instead, he argues that section 608b applies only to "marketing agreements" made under section 608 and not to "orders" issued under section 608c, citing *In re Midwest Milk Monopolization Litigation*, 380 F.Supp. 880, 815 (W.D.Mo.1974). I do not accept this reasoning.

There is no substantial difference between the making of a marketing agreement and the issuance of a hop order. Marketing agreements are made between the Secretary and producers to limit production of agricultural commodities and allow for parity prices. 7 U.S.C. § 608(2). Orders are issued by the Secretary if he has reason to believe that they will effectuate the purposes of the Act, one of which is to achieve parity prices. 7 U.S.C. § 608c. Because the Secretary issued the annual hop orders after considering HAC's annual recommendations, the hop orders resemble marketing agreements for purposes of section 608b. *Cf. Chiglades Farm, Ltd. v. Butz,* 485 F.2d 1125, 1134–35 (5th Cir.1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3170, 41 L.Ed.2d 1138 (1974). Section 608b immunity should apply. Accordingly, defendants are immune for acts committed within their statutory authority.

Defendants also argue that the antitrust claim and the tortious interference claim should be dismissed under 7 C.F.R. § 991.-74, which provides:

> *Personal Liability.*
> No member or alternate member of the committee and no employee or agent of the committee shall be held personally responsible, either individually or jointly

with others, in any way whatsoever, to any person for errors in judgment, mistakes, or other acts, either of commission or omission, as such member, alternate, employee, or agent, *except for acts of dishonesty, willful misconduct, or gross negligence.*

(emphasis added).

Other than vague and conclusory allegations, there are no charges that fit within the exceptions to immunity. Thus dismissal of both claims is appropriate under the regulation.

■ The antitrust claim should also be dismissed because the statutory and regulatory framework here creates an implicit immunity to the antitrust laws under *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In *Keogh* the Court held that a private party could not bring an antitrust action based on a conspiracy to fix limits already approved by the Interstate Commerce Commission. Here, plaintiff may not bring an antitrust action based on a conspiracy to set rates already approved by the Secretary. *See also In re Wheat Rail Freight Rate Antitrust Litigation,* 579 F.Supp. 517, 529–37 (N.D.Ill.1984).

In *Phonetele, Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716 (9th Cir.1981), *cert. denied,* 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983), the Ninth Circuit set the following requirements for implied immunity.

A regulatory mandate sufficient to confer implied antitrust immunity may in some cases exist in the presence of the following three elements: First, explicit congressional approval of the ultimate anticompetitive effect of the challenged conduct; second, explicit authorization by Congress to an agency or private entity to order the challenged anticompetitive conduct; and third, no inconsistency between the challenged conduct and an express policy of the governing agency.

664 F.2d at 731–32.

The requirements are met here. The Act explicitly approves the anticompetitive effect of orders like those issued here. Section 608c specifically authorizes the Secretary to issue orders limiting the total quantities of commodities produced and alloting those amounts among producers. For the reasons discussed above, there is also no inconsistency between the conduct challenged here and the express policies found in the 1966 Order.

Because there is a "plain repugnancy between the antitrust and regulatory provisions," *Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), implied immunity arises. It is necessary to make the regulatory scheme here work. The specter of antitrust liability could wreck the administrative committee system presently used to regulate agricultural production. Ingenious lawyers encouraged by the prospect of triple damages and large attorney's fees have the resources to engage in interminable discovery and pretrial litigation. The economic and personal costs to defendants, particularly individual defendants, are enormous. Growers would not serve as members of administrative committees if they knew that dissatisfied growers could unleash the monster of federal antitrust litigation upon them, with the resulting financial consequences.

Allegations of self-dealing in the antitrust context can be made all too easily when growers participate in the regulation of their own industry. The problem is even more acute when quantities produced are regulated. Any committee recommendation may benefit one or more members to the detriment of other growers. This complaint is a good example of the problem. The express and implied antitrust immunity offered to committee members would provide cold comfort if conclusory allegations like these are permitted to stand.

Express immunity is allowed to the extent that committee members act within their statutory authority. Similarly, implied immunity is allowed to the extent necessary to make the regulatory system work. *Silver v. New York Stock Ex-*

*change,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

This complaint has not alleged conduct that crosses the threshold at which immunity ends. Plaintiff argues that defendants willfully acted in a manner expressly prohibited by the applicable regulations when they agreed to set saleable percentages for future marketing years. I disagree. This practice was not prohibited by the regulations in the 1966 Order. While 7 C.F.R. § 991.36 does not empower HAC to plan for future marketing years, nothing in the 1966 Order prohibits this. Nothing prohibits defendants from developing a long range agreement or recommendation as to future marketing years, so long as HAC annually reconsiders the factors enumerated in 7 C.F.R. § 991.36.

The allegation that defendants allowed the filing of deficiencies through illegal means is too vague and conclusory to pierce antitrust liability. The allegation that defendants caused the establishment of the saleable percentages as agreed without notice is also insufficient. It is true that plaintiff had no administrative remedies for challenging HAC's failure to give notice or follow other regulations. Nevertheless, if plaintiff disagreed with the amounts set by the Secretary, plaintiff could have proceeded under the Act to have the orders declared invalid. *See Prune Bargaining Association v. Butz,* 444 F.Supp. 785, 789–91 (N.D.Cal.1975), *aff'd,* 571 F.2d 1132 (9th Cir.1978) (per curiam).

For similar reasons I reject plaintiff's argument that the allegation that the Secretary "rubber stamps" the committee's recommendations is sufficient to pierce immunity. Orders are made by the Secretary, not the HAC. The Secretary is not bound by HAC's recommendation, and has an independent duty to evaluate the need for limiting hops production. 7 C.F.R. §§ 991.71, 991.37. The Secretary has stated that the recommendations for the marketing years from 1981–82 to 1984–85 were consistent with the Act. *E.g.,* 49 Fed.Reg. 18813 (setting saleable quantity for 1984–85 marketing year). If plaintiff believed

that the Secretary did not exercise his discretion or did so in a way contrary to the Act, judicial review was possible. *See Stark v. Wickard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *Prune Bargaining,* 444 F.Supp. at 789–91.

There are no allegations that the agreement to fix rates was not fully disclosed to other growers or the Secretary and his representatives. There are no allegations that the agreement or subsequent recommendations were fraudulent. Defendants remain immune.

In reaching this decision, I do not rely on *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. These cases have held that the antitrust laws were not intended to invalidate "state action" regulating economic activity under certain circumstances. Because these cases are based in federalism, they are inapposite. The present case involves a conflict between differing federal policies, rather than differing state and federal policies.

■ Defendants Obendorf and Newhouse also moved to dismiss for insufficiency of process, pursuant to Fed.R.Civ.P. 12(b)(5). Both defendants admitted that they received service through first class mail, but contended this was improper. Both have since been personally served. Their motions to dismiss on this ground are therefore moot.

### CONCLUSION

The antitrust claim is dismissed because of immunity. The pendent tortious interference claim is dismissed because of immunity and also because there is incomplete diversity. The dismissal is without prejudice, and plaintiff has twenty days leave to file an amended complaint. The 12(b)(5) motion to dismiss by defendants Newhouse and Obendorf is denied as moot.

### ON MOTION TO DISMISS SECOND AMENDED COMPLAINT

Defendants move to dismiss plaintiff's second amended complaint. I grant the motion.

## BACKGROUND

Plaintiff Louis Berning brings claims for antitrust violations and a pendent claim for tortious interference with prospective advantage. Plaintiff was a hop grower. All but one of the defendants are hop growers who were or are members of the Hop Administrative Committee (HAC). Defendant Robert Eaton, while not a grower, was HAC's manager during the relevant time. I dismissed the original complaint by opinion and order dated June 25, 1985, finding defendants immune from both claims.

Plaintiff then filed an amended complaint and a second amended complaint. Defendants Obendorf, Rooney, Signorotti, Goschie, Coleman, Gasseling, Shinn, Newhouse, Desserault, Roy, Koreski, Riel, and Eaton, and defendant Gooding moved separately to dismiss. After a hearing on the motions, I requested further briefing. I now grant the motions as to both claims.

## STANDARDS

When a federal court rules on a motion to dismiss for failure to state a claim, the court must review the sufficiency of the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The court should construe the allegations in the complaint most favorably to the pleader.

> In evaluating the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted).

## DISCUSSION

HAC was created pursuant to the Agricultural Marketing Agreement Act of 1937 (the Act), 7 U.S.C. § 601 *et seq.* The Act empowers the Secretary of Agriculture to "establish and maintain ... orderly marketing conditions for agricultural commodities" so that farmers would receive "parity prices" for the commodities. 7 U.S.C. § 602(1). The Act allows the Secretary to issue marketing orders for certain commodities, including hops. 7 U.S.C. §§ 608c(1), (2). Hop orders may contain terms "limiting ... the total quantity ... during any specified period or periods" and "apportioning ... the total quantity of hops of the then current calendar year ... equitably among all producers." 7 U.S.C. § 608c(6)(G).

In 1966, at the request of hop growers, the Secretary issued the Hops Marketing Order (1966 Order), found at 7 C.F.R. § 991. Growers approved the 1966 Order by referendum. The 1966 Order provides for the creation of HAC. Members are growers appointed by the Secretary, and are subject to removal by the Secretary at any time. 7 C.F.R. §§ 991.17, 991.37.

HAC's duties include adopting a hops marketing policy and making recommendations to the Secretary for the "salable quantity" and "allotment percentage" of hops. 7 C.F.R. § 991.36. The policy and recommendations pertain to the "ensuing marketing year," defined as from August 1 to July 31 of the next crop year. 7 C.F.R. §§ 991.10, 991.36. In making the recommendations, HAC should consider several factors affecting marketing conditions. 7 C.F.R. § 991.36.

On the basis of HAC's recommendation or other information, the Secretary may decide to limit the salable quantity for that marketing year if this would effectuate the purposes of the Act. 7 C.F.R. § 991.37. The Secretary is not bound by HAC's recommendations.

*Rights of the Secretary.*

. . . . .

> Each and every decision, determination, and other act of the committee shall be subject to the continuing right of disapproval by the Secretary at any time. Upon such disapproval, the disapproved action of the Committee shall be deemed null and void, except as to acts done in reliance thereon or in accordance thereof

prior to such disapproval by the Secretary.

7 C.F.R. § 991.71.

In his original complaint, plaintiff alleged the following. At HAC's 1980 meeting, defendants conspired to recommend "salable percentages" for the 1981 to 1987 years. The percentages were to vary from 100% to 130%, with most years set at 130%. The Secretary adopted the percentages for the 1981 to 1984 crop years, routinely approving the recommendations without conducting an independent analysis.

Plaintiff further alleged that the salable percentages were made without regard to factors affecting marketing conditions, that there was no notice or opportunity for hearing regarding the recommendations, and that the recommendations were made in a way that allowed the "filling of deficiencies through illegal means." Plaintiff alleged that these tactics allowed defendants to "usurp the market for hops to themselves," leaving plaintiff unable to profitably grow or market hops.

In my earlier opinion, I found that defendants were expressly immune from antitrust liability for acts within their statutory authority under section 608b of the Act, which provides that the making of marketing agreements shall not violate the antitrust laws. I found that defendants were immune from both antitrust liability and liability for tortious interference under the 1966 Order, which provides that HAC members and agents shall not be liable for errors in judgment, except for acts of dishonesty, willful misconduct, or gross negligence. 7 C.F.R. § 991.74.

I also found that defendants were impliedly immune from antitrust liability, under the doctrine developed from *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In his arguments opposing dismissal of the second amended complaint, plaintiff focuses on this ruling.

 Implied immunity reconciles the inherent conflict between regulatory and antitrust statutes. It is allowed only where

necessary to make the system work, and only to the minimum extent necessary. *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

Plaintiff makes the following new factual allegations in the second amended complaint.

1. Defendants conspired at a nonofficial meeting [before the 1980 meeting] to fix the price and production levels of hops for purposes of personal gain. (¶ 12.)

2. Defendants knew their conduct was wrong. In October 1980 defendant Rooney acknowledged to the other defendants that in their official capacity they could recommend a salable percentage for only one year at a time. (¶ 15.)

3. Defendants entered into personal contracts for sale of hops at the increased levels proposed for years 1980–85 before announcing [in 1980] to other growers the intent to set future minimum salable percentages at the increased levels and before the salable percentages were adopted by the Secretary. (¶ 14.e.)

4. Defendants represented to growers and dealers in 1980 that they could safely contract at or above the proposed increased levels. Defendants made these representations before the salable percentages were adopted by the Secretary. (¶ 14.f.)

5. Defendants declined to take or recommend any action that would "cut across contracts," including their personal contracts, knowing the failure to do so was destroying the hops market for growers who had no prior knowledge of the alleged conspiracy and who had not sold future years' crops pursuant to the conspiracy. (¶ 14.g.)

6. Defendants permitted growers, including themselves, to market hops in excess of their annual allotment. (¶ 14.h.) Defendants caused increases in the salable percentages for 1980 and 1981 after the time for such changes had expired. (¶ 14.c.)

**34**

7. Plaintiff marketed his crops by selling future years' crops and by selling in the spot market. (¶ 10.) He expected that HAC would make recommendations for only one year at a time and could not market his hops because the market had disappeared. (¶ 18.a.)

■ The most significant allegation is that committee members entered into futures contracts at the increased levels before announcing the increased recommendation to other growers. I asked the parties to brief whether contracting to sell crops to be grown beyond the ensuing marketing year was illegal. Plaintiff argues that such "out year" sales are prohibited to the extent that they exceed the minimum salable percentage established by the 1966 Order. Presumably, plaintiff means that the 1966 Order does not permit a grower's sales of out year crops to exceed his current salable percentage. I disagree.

The 1966 Order is detailed and complex, yet contains no prohibition of such sales. The only possible limitation is found in 7 C.F.R. § 991.37(a), which provides that "[e]xcept as provided in this [order], no handler may handle hops other than salable hops." "Salable hops" appear to be limited to those actually delivered or sold.

"Salable hops" means those hops released for handling, including commercial acquisition or use, by the allotment percentage pursuant to § 991.37 and which constitute the annual allotment of procedures.

7 C.F.R. § 991.5.

The 1966 Order speaks in terms of actual movement into commerce rather than contracting to sell in the future. See 7 C.F.R. §§ 991.5, 991.9. The limitation on salable hops also applies to handlers, rather than "producers," or growers. See 7 C.F.R. §§ 991.7, 991.8, 991.9 (defining producer and handler). The 1966 Order does not forbid a grower from contracting to sell salable hops from out years in amounts exceeding their current salable percentages.

Should a grower find that his current crop is not sufficient to fill a futures contract that is due, the 1966 Order does not forbid his covering the shortfall. In fact, the Order appears to facilitate this, as it allows growers to transfer allotment base to other growers. See 7 C.F.R. §§ 991.46, 991.146 (describing allotment base transfer procedures). By purchasing another grower's allotment base to cover a shortfall, a grower may avoid defaulting on a futures contract.

Plaintiff cites the Secretary's order of June 26, 1985 (1985 Order), which terminates the 1966 Order as of the end of 1985. In the 1985 Order, the Secretary criticized out year futures practices.

There is a conflict between the [1966] order provision permitting only one-year volume regulation and contracting practices in the hop industry. The order provides that the HAC can recommend a volume regulation for only the following marketing year. However, the practice in the industry is for producers and handlers to contract for three to five years. This conflict has created serious problems for the industry and has resulted in the establishment of salable quantities in excess of market needs to allow producers to fulfill their contractual obligations. Since the Act was intended to eliminate such imbalances between supply and demand, the volume regulation recommendation provisions of the order have clearly failed.

50 Fed.Reg. 26997, 26998 (1985).

The 1985 Order does not conclude that the futures sales practices violated the 1966 Order. Rather, the Secretary appears to conclude that inadequacies in the 1966 Order allowed this practice to occur.

Plaintiff cites another provision of the 1985 Order to support his argument that implied immunity is not necessary to make the administrative committee system work.

The salable quantity recommended for the past several years has not accurately reflected market needs but rather has attempted to prevent the allotment percentages from cutting across the contracts producers have with dealers and to

keep the price of leased base at reasonable levels. This has resulted in actions by producers that are outside of the order's purpose such as the leasing of allotment base to other producers, and has caused considerable controversy both within and outside the hop industry over certain provisions of the current program.

Moreover, the order restricts entry so that producers who did not receive allotment base when the order was issued in 1966 had to either inherit, purchase, or lease allotment base in order to market hops.

50 Fed.Reg. 26997 (1985).

Plaintiff argues that the 1985 order shows that immunity is not necessary. I disagree. The 1985 Order is part of a plan to make major changes to the system set up by the 1966 Order. *Friends of the Hop v. Block,* 753 F.2d 777, 778 (9th Cir.1985). That the Secretary disagrees with the current regulatory framework does not diminish immunity's importance to the administrative committee system, whether under the 1966 Order or some future order.

If growers are to assist in the regulation of their own industry, immunity is vital. Charges of self-dealing can be made all too easily, particularly in an industry embroiled in controversy. There was nothing illegal about making out year futures contracts. There was nothing illegal about making such contracts before the 1980 meeting. No one would challenge these contracts if they were made by a grower who did not serve on HAC. Growers who serve on administrative committees should not be restrained from making the same futures contracts that other hop growers are free to make. To hold otherwise would provide a strong disincentive to participation in the administrative committee system.

It is immaterial whether HAC members knew of the five year salable percentage proposal before the 1980 meeting and sold futures accordingly before the proposal was adopted at the meeting. Plaintiff was free to challenge the annual recommendations at any HAC meeting held between 1981 and 1985. After the Secretary adopted the annual recommendation, plaintiff could have challenged the orders a second time. Judicial review was also possible. *See Prune Bargaining Association v. Butz,* 444 F.Supp. 785, 789–91 (N.D.Cal. 1975), *aff'd,* 571 F.2d 1132 (9th Cir.1978) (per curiam) (outlining administrative and judicial review procedures).

A grower who serves as an administrative committee member should not be forced to avoid futures contracting just because he knows that a contract he makes might be affected by a recommendation that the committee might make to the Secretary which the Secretary might adopt. The committee member should not be forced to wait until after every annual meeting before he makes futures contracts. To do so could place him at a strong disadvantage.

Motive and knowledge are difficult to prove. If a committee member is to contract like other growers, he should not have to prove his innocence through litigation. The appearance of fairness doctrine should not apply to antitrust claims against administrative committee members. Committee members are different than government employees. Members compete with other growers for their livelihood. Any decision they make may benefit some growers and hurt others.

The allegation that defendants failed to recommend any action that would "cut across" their personal contracts and remedy the effects of the 1980 proposal is also insufficient to avoid express or implied immunity. Nothing in the 1966 Order imposes such a duty, other than requirements that members analyze appropriate factors in recommending annual production figures to the Secretary. This allegation amounts to second-guessing HAC's application of those factors. If the conduct in 1980 was immune from the antitrust laws, the failure to remedy the effects of this conduct is also immune. The same applies to the allegation that defendants represented to growers and dealers that they could safely contract at or above the proposed increase

levels before they were adopted by the Secretary.

The allegations that defendants caused increases in salable percentages for 1980 and 1981 after the time for such changes had expired also fails to avoid immunity. The only apparent way defendants could have done so was through recommendations to the Secretary. Any increase had to be approved by the Secretary. There is no allegation that the Secretary did not approve these increases, or that plaintiff challenged the increases through the avenues available under the Act.

Plaintiff also appears to argue that I should reconsider my earlier ruling dismissing the original complaint. Plaintiff relies heavily on *United States v. Borden*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). In *Borden*, the district court dismissed an indictment alleging that milk distributors, a milk producers cooperative, labor union officers, municipal officials, and arbitrators had conspired to fix milk prices in the Chicago area. The district court held that the Agricultural Marketing Agreement Act wholly destroyed operation of the antitrust laws with respect to the marketing of agricultural commodities, reasoning that only the Secretary of Agriculture could intervene in price matters.

The Supreme Court reversed, holding that the complaint should not have been dismissed under either the implied or express immunity doctrines.

> The Agricultural Act declares it to be the policy of Congress "through the exercise of the powers conferred upon the Secretary of Agriculture through this chapter, to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities [purchasing power]".... To carry out that policy a particular plan is set forth. Farmers and others are not permitted to resort to their own devices and to make any agreements or arrangements they desire, regardless of the restraints which may be inflicted upon

commerce. The statutory program to be followed under the Agricultural Act requires the participation of the Secretary of Agriculture who is to hold hearings and make findings. The obvious intention is to provide for what may be found to be reasonable arrangements in light of the circumstances disclosed. The methods are twofold, marketing agreements and orders. To give validity to marketing agreements the Secretary must be an actual party to the agreements.... The orders are also to be made by the Secretary for the purpose of regulating the handling of the agricultural commodity to which the particular order relates.... As to agreements and arrangements not thus agreed upon or directed by the Secretary, the Agricultural Act in no way impinges upon the prohibitions and penalties of the Sherman Act....

308 U.S. at 199–200, 60 S.Ct. at 188–89.

The Court then examined the explicit immunity provisions under the Act.

> [T]he Agricultural Act itself expressly defines the extent to which its provisions make the antitrust laws inapplicable.

> · · · · ·

> These explicit provisions requiring official participation and authorizations show beyond question how far Congress intended that the Agricultural Act should operate to render the Sherman Act inapplicable. If Congress had desired to render any further immunity, Congress doubtless would have said so.

> An agreement made with the Secretary as a party, or an order made by him, or an arbitration award or agreement approved by him, pursuant to the authority conferred by the Agricultural Act and within the terms of the described immunity, would of course be a defense to a prosecution under the Sherman Act to the extent that the prosecution sought to penalize what was thus validly agreed upon or directed by the Secretary. Further than that the Agricultural Act does not go.

*Id.* at 201–02, 60 S.Ct. at 189–90.

The Court found it unnecessary to decide whether a particular order or agreement

provided antitrust immunity. No order or agreement was in effect during a three-and-a-half year period when defendants allegedly conspired to set prices. *Id.* at 202, 60 S.Ct. at 190.

Plaintiff argues that I should rely on *Borden* and disregard *Keogh*, where the Court held that a private party could not bring an antitrust claim based on a conspiracy to fix limits already approved by the Interstate Commerce Commission under a regulatory statute. *Borden* is distinguishable, however, from both *Keogh* and the present case. The indictment in *Borden* alleged that defendants acted without any approval by the Secretary. Here, as in *Keogh*, recommendations were approved by the Secretary. While the Secretary here did not approve the five year plan made in 1980, he did approve all five recommendations when presented for annual review.

*Borden* is distinguishable in other ways from this case. Defendants in *Borden* had the final word as to the milk prices they allegedly fixed. Here, the Secretary had the final word. Plaintiff here alleges essentially that defendants gave an opinion as to what out year production recommendations should be. This is very different from agreeing what prices will be, as in *Borden*. The *Borden* indictment also charged that defendants enforced the agreement through a program of kickbacks, intimidation, and violence. *United States v. Borden*, 28 F.Supp. 177, 180–81 (N.D.Ill.1939), *rev'd in part and aff'd in part*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Here, the five year plan was publicly disclosed at the 1980 meeting, and of course there are no allegations of kickbacks or violence. Defendants here are immune, whether under express or implied immunity.

Discovery has been stayed in this case pending resolution of dismissal motions. Immunity would have little value to administrative committee members if I allowed this complaint to stand and permitted a costly discovery and motion process to begin. This dispute should have been resolved through the administrative process, and should not be resolved through the antitrust laws.

## CONCLUSION

I grant defendants' motions to dismiss the second amended complaint. Plaintiff's antitrust claim fails to state a claim and should be dismissed. Defendants argue persuasively that the tortious interference claim should be dismissed as time barred. Because that claim has no independent ground of jurisdiction, I need not reach the merits of that issue, and dismiss the second claim for lack of jurisdiction.